FIL[ED]
CLERK, U.S. [ ]

2004 MAY -3 P 2: 25

DIST[RICT] OF UTAH

BY: [signature]
DE[PUTY]

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| UTAH GOSPEL MISSION, FIRST UNITARIAN CHURCH OF SALT LAKE CITY, SHUNDAHAI NETWORK, UTAH NATIONAL ORGANIZATION FOR WOMEN, and LEE J. SIEGEL,<br><br>       Plaintiffs,<br><br>vs.<br><br>SALT LAKE CITY CORPORATION, a municipal corporation, ROSS C. "ROCKY" ANDERSON, Mayor of Salt Lake City, in his official capacity; and CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,<br><br>       Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>**Case No.  2:03CV688 DAK** |

This matter is before the court on (1) Plaintiffs Utah Gospel Mission, First Unitarian Church of Salt Lake City, Shundahai Network, Utah National Organization for Women, and Lee J. Siegel's (collectively referred to as "Plaintiffs") Motion for Preliminary Injunction, (2) Defendants Salt Lake City Corporation (the "City") and Ross C. ("Rocky") Anderson's (the "Mayor") (collectively referred to as the "City Defendants") Motion to Dismiss, (3) Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints' (the "LDS Church" or

**101**

the "Church")[1] Motion to Dismiss, (4) Plaintiffs' Motion to Strike Materials from Defendants' Motion to Dismiss, (5) Plaintiffs' Motion to Strike Declarations of Thomas G. Alexander and Ross C. Anderson, or in the Alternative, for Leave of Court to Depose Declarants and Supplement the Record, and (6) the LDS Church's Motion to Strike Barber Declaration and Portions of Eyer Declaration.

A hearing on the motions was held on January 26, 2004. At the hearing, Plaintiffs were represented by Mark J. Lopez, the City was represented by Steven W. Allred, and the LDS Church was represented by Alan L. Sullivan. Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties. Since taking the motions under advisement, the court has further considered the law and facts relating to the motions. The court has also considered the supplemental materials submitted to the court following the January 26, 2004 hearing, including: (1) two letters containing supplemental authority and argument from Plaintiffs, both of which were dated February 12, 2004; (2) the LDS Church's February 17, 2004 response to Plaintiffs' supplemental letters; (3) the City's February 19, 2004 response to Plaintiffs' supplemental letters; (4) Plaintiffs' February 19, 2004 third supplemental letter; and (5) the LDS Church's February 23, 2004 response to Plaintiffs' third supplemental letter. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. BACKGROUND

The instant litigation is the second round of a long-standing and divisive dispute

---

[1] The Corporation of the Presiding Bishop is a corporate entity wholly owned by the LDS Church. Both entities are referred to herein as the "LDS Church" or the "Church."

2

pertaining to the City's sale to the LDS Church of a block of Main Street (the "Main Street Plaza") in downtown Salt Lake City, Utah. The first round of this dispute involved the City's sale of Main Street Plaza and the City's reservation of an easement (the "Pedestrian Easement" or "Easement") through the Plaza while at the same time allowing the LDS Church to control behavior and limit First Amendment activity on the Plaza. The Tenth Circuit Court of Appeals ultimately determined that the Easement itself was a public forum for First Amendment purposes and that the City and Church could not prohibit protected speech on the Pedestrian Easement. *See First Unitarian Church v. Salt Lake City Corp.*, 308 F.3d 114 (10th Cir. 2002) ("*Main Street I*").[2]

The instant action–round two of the dispute–involves the fallout from the Tenth Circuit's decision in *Main Street I* and specifically the constitutionality of the City's sale to the LDS Church of the Pedestrian Easement. Through the sale of the Easement, the LDS Church secured the right to prohibit First Amendment activity on the Main Street Plaza, and, in exchange, the City obtained 2.125 acres of LDS Church-owned property in the Glendale neighborhood of the City, payment of half the attorneys' fees awarded against the City in the previous litigation, and $5 million in cash and land from the Alliance for Unity. In total, the City obtained, among other things, over $5.375 in land and cash in exchange for the Pedestrian Easement, which had been valued at $500,000.

---

[2] The court's references to *Main Street I* generally refer to the Tenth Circuit Court of Appeals' decision. 308 F.3d 1114 (10th Cir. 2002). The court also refers to the district court's opinion as *Main Street I*, but such references will contain citations to the Federal Supplement, *see* 146 F. Supp. 2d 1155 (D. Utah 2001).

Plaintiffs believe that the Mayor's decision to sell the Pedestrian Easement was brought about by the undue influence of the LDS Church. In particular, they assert that the pressure brought to bear by the Church and its threat of community divisiveness was the major consideration in the Mayor's decision to capitulate to the Church's demands—even if it meant sacrificing the public interest in maintaining the Easement.

The City and the Church, on the other hand, argue that the Mayor proposed a compromise that, among other things, would bring many secular benefits to the City, including obtaining land and cash valued at over $5.375 million, putting to rest the legal battles between the City and the Church, and helping to heal the wounds of a City divided along religious lines.

The question in this case is whether the sale of the Pedestrian Easement, however characterized by the parties, (1) violated Plaintiffs' rights to freedom of expression and assembly under the First and Fourteenth Amendments to the United States Constitution, and (2) constituted an improper establishment of religion under the First and Fourteenth Amendments to the United States Constitution and Article I, Section 4 of the Utah Constitution.[3]

The events leading up to the present litigation are well known and largely undisputed.[4] Many of the underlying facts are reported in the Tenth Circuit Court of Appeals' decision in

---

[3] The First Amendment to the United States Constitution is made applicable to state governments and their political subdivisions by operation of the Fourteenth Amendment. *See Wallace v. Jaffree*, 472 U.S. 38, 48-49 (1985).

[4] The parties, however, differ significantly on their characterization of several of the events. While the court must, on a motion to dismiss, accept Plaintiffs' well-pleaded allegations as true, it need not accept as true conclusory allegations or characterizations. *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 510 (10th Cir. 1998).

*Main Street I*, 308 F.3d at 1117-20. In addition, the court has relied on Salt Lake City Ordinance No. 31 of 2003, which includes, as Exhibits A and B respectively, the Settlement Agreement and Amended Special Warranty Deed, which are discussed extensively below.[5] Many of the facts set forth below are not essential to the court's legal analysis, but are set forth to provide historical context to this contentious controversy.

## A. THE LDS CHURCH'S 1999 ACQUISITION OF THE MAIN STREET PLAZA

This case involves a two-acre parcel of land (the "Property") located between North Temple Street and South Temple Street in downtown Salt Lake City. The LDS Church owns all the property on the two city blocks on the east and west sides of this portion of the former Main Street. On these blocks, the Church maintains a number of important historical, administrative, and worship facilities. The west block is called "Temple Square" and contains the Tabernacle and the Salt Lake Temple; the east block houses the Church administration buildings. Before the City closed and sold it to the LDS Church, the Property was a section of Main Street, consisting of a typical public street and adjoining public sidewalks. In 1995, the City sold the LDS Church the subsurface rights to this portion of Main Street, which the Church eventually developed into an underground parking garage. The sale agreement for that transaction also gave the LDS Church a right of first refusal on the surface property, if the City ever decided to sell it.

---

[5] This court's consideration of these documents does not convert the instant motions to dismiss to motions for summary judgment because the documents are referred to in Plaintiffs' Third Amended Complaint and are central to Plaintiffs' claims. *See GFF v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Furthermore, "a court may take judicial notice of matters of public record outside the pleadings without converting a motion to dismiss" into a motion for summary judgment." *See* James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.30 [4] (3d ed. 1997).

In 1998, the City explored the possibility of closing the surface portion of Main Street and selling it to the LDS Church. On December 1, 1998, the City and LDS Church officials held a joint news conference to announce a proposal to develop an open-space pedestrian plaza on Main Street between North and South Temple. The LDS Church indicated that it was interested in such a purchase in order to construct a pedestrian plaza that would unify its international headquarters campus, which the Property (as a street) then bisected.

On April 13, 1999, after hearings before the Planning Commission and the Salt Lake City Council, the City Council passed Ordinance No. 28 of 1999, closing the Property to public use. On April 27, 1999, the LDS Church purchased the Property for $8.124 million, which represented the appraised fair market value of the Property in fee simple absolute, without any significant encumbrances. *Main Street I*, 146 F. Supp. 2d 1155, 1159-61 (D. Utah 2001) *rev'd on other grounds by Main Street I*, 308 F.3d at 1133. Nevertheless, in the April 27, 1999 Special Warranty Deed (the "Special Warranty Deed") conveying the Property, the City reserved several easements. Among these was the Pedestrian Easement. Despite the reservation of the Easement, the $8.124 million purchase price was not altered.

Unlike a typical public sidewalk easement, the Pedestrian Easement had no dimensions (no metes and bounds), no specific location, and no physical existence. Rather, it was purely a legal right to access and pass across the Property. Although the Easement guaranteed a public right of way through the property, it otherwise granted the LDS Church unfettered discretion to control all other conduct on the Plaza–including First Amendment activity. The Pedestrian Easement was specifically defined to ensure that the Property and eventual Plaza would not be

6

dedicated to public ownership or constitute a First Amendment forum of any kind.  Among other limitations, the Special Warranty Deed stated that the "Property is and shall at all times remain the private property of [the Church]" and that nothing in the Easement "shall be deemed to create or constitute a public forum, limited or otherwise."  The Special Warranty Deed set forth an illustrative list of prohibited activities, including "loitering, assembling, partying, demonstrating, picketing, distributing literature, soliciting, begging, littering."

The terms of the Pedestrian Easement later became the center of a heated public controversy, with some accusing the LDS Church and the City administration of misleading the Salt Lake City Council as to the limited scope of the Easement.  In response, on May 16, 2000, the Salt Lake City Council passed Ordinance No. 29 of 2000, which reaffirmed the sale of the Property and the Council's full understanding of all its terms.

After purchasing the Property, the LDS Church, at its own expense, removed the street and sidewalks and replaced them with the improvements that now constitute the Plaza.  As provided in the Easement, the LDS Church allowed public access and passage over the Plaza. The LDS Church did not permit soliciting, begging, demonstrations, protests, leafleting, or other disruptive activities on the Plaza.

## B.  PHYSICAL DESCRIPTION OF THE MAIN STREET PLAZA

Main Street runs north-south through downtown Salt Lake City.  The block sold to the LDS Church is bounded on the north by North Temple Street and on the south by South Temple Street.  Directly to the north along Main Street lies a residential neighborhood rising along a hill on the north end of town.  The neighborhood is comprised of high-rise and low-rise apartment

7

buildings and single family homes. The Daughters of the Utah Pioneers Museum is at the crest

of the hill, with the State Capitol building located one block east, on State Street.[6] To the south

is the City's central business and commercial district, which includes two large shopping malls,

as well as office and residential high-rises.

The Plaza is surrounded on both sides by other LDS Church-owned property. The east

side of the Plaza borders Church-owned property containing, among other things, the Joseph

Smith Memorial Building, the Relief Society Building, and the Church Administration Building.

*See Main Street I*, 146 F. Supp. 2d at 1168. There is no clear line demarcating the two

technically distinct properties. *See id.* The west side of the Plaza borders the wall of Temple

Square. *See id.* Moving farther north, along the west side of the Plaza, the solid wall of Temple

Square ends, exposing the east face of the Temple to the Plaza. *See id.* Prior to the sale of the

Plaza to the LDS Church, much of the inner courtyard of the Temple had been blocked from full

public view by a solid wall about twelve feet high. However, to integrate the Temple grounds

with the Plaza, the LDS Church removed a large section of the wall, exposing the Temple's inner

courtyard to the Plaza. *See id.*

In building the Plaza, the LDS Church altered the physical character of the Property. The

common City street and sidewalks that once existed on the Property were removed and replaced

by a religiously oriented pedestrian plaza–a landscaped "ecclesiastical park"–that is closed to

---

[6] Plaintiffs have alleged that the State Capitol building is located at the crest of the hill on Main Street. While not relevant to the court's legal analysis below, the court takes judicial notice of the undisputable fact that the State Capitol building is not located on Main Street; rather, it is located on State Street, one block east of Main Street.

vehicular traffic and that "fits seamlessly into the Church's downtown campus." *Main Street I*, 308 F.3d at 1119. As one enters the Plaza from the north or the south, the walking surface changes from the ordinary concrete of the City sidewalk to distinct reddish-grey granite pavers. *Main Street I*, 146 F. Supp. 2d at 1167. "The Church Plaza's entrances are marked by large planters placed on large stone structures containing waterfalls." *Id.* A person cannot enter the Plaza from the public streets without passing within a few feet of a large stone sign, announcing that the Plaza is the property of the LDS Church. As found in *Main Street I*, "all of the surroundings alert the pedestrian that he or she has entered an enclave that is distinct from the public area." *Id.*

The centerpiece of the Plaza is an oval reflecting pool that creates a mirror-like image of the Temple and a dramatic visual effect: the Temple appears projected outward onto the center of the Plaza. *See id.* at 1168. The Plaza also contains the entrance to the Temple itself, which was formerly located on North Temple Street. *See id.* at 1168. The Plaza and the adjoining Temple Square and Church Administration properties now share numerous common physical features that create thematic unity among these religious sites. *Id.* at 1167-68.

Plaintiffs allege that the Plaza provides a unique forum for the distribution of literature and social intercourse because people are more likely to gather and are more approachable than they might be when they pass by on the street. In addition, they claim, the Plaza is a unique site because it anchors the world headquarters of the LDS Church, which is a "major political player" in Utah. They further allege that engaging in First Amendment activity on the Plaza is a very direct way of influencing public policy by bringing pressure on the Church. They contend that it

is similar to protesting in front of City Hall or the State Capitol, where they can generate publicity and achieve results.[7]

## C. THE *MAIN STREET I* LITIGATION

In June 2000, the First Unitarian Church of Salt Lake City and others, with the American Civil Liberties Union ("ACLU") as counsel, sued the City in the United States District Court for the District of Utah, alleging both Free Speech and Establishment Clause claims. Generally, Plaintiffs objected to the fact that the Pedestrian Easement had been written to permit the LDS Church to control behavior and limit First Amendment activity on the Plaza. The LDS Church intervened as a party defendant to protect its property rights. *Main Street I,* 146 F. Supp. 2d at 1167-68. On May 4, 2001, the District Court, the Honorable Ted Stewart presiding, entered summary judgment for the City and the LDS Church, holding that the Easement did not create a public forum for expressive activities or otherwise violate the First Amendment to the United States Constitution.

On October 9, 2002, the United States Court of Appeals for the Tenth Circuit reversed the District Court's decision. *Main Street I*, 308 F.3d at 1133. Disagreeing with the District Court, the Tenth Circuit held that the Easement itself was a public forum for First Amendment purposes. *Id.* at 1122. "Easements are . . . constitutionally cognizable property interests" and therefore constitute a "significant enough property interest" to be "subject to forum analysis." *Id.* at 1122-23. Accordingly, the court held that the City and the Church could not prohibit

---

[7] Although it is not relevant to the court's consideration of the Defendants' Motions to Dismiss, the court notes that Defendants disagree with this contention. *See, e.g., infra* n.20.

protected speech on the Easement. *See id.* at 1133. The Tenth Circuit offered the City the choice of either permitting "speech on the easement" or relinquishing "the easement so the parcel becomes entirely private," which would eliminate the public forum and make the Plaza fully subject to LDS Church control. *Id.* at 1132. On remand to the United States District Court, District of Utah, the Honorable Ted Stewart issued an Order declaring that the Plaza is a public forum and enjoining the City from further interference with Plaintiffs' First Amendment rights–subject to reasonable time, place, and manner regulations.

## D.   THE ENSUING DISPUTE OVER THE PEDESTRIAN EASEMENT AND THE MAYOR'S PROPOSED SOLUTION

Following the Tenth Circuit's decision, a heated dispute arose between the City and the LDS Church over the continuing validity of the Easement established in the Special Warranty Deed.[8] On the one hand, the LDS Church undertook a widely publicized public relations campaign to protect its interest in and reassert control over First Amendment activity on the Plaza. It took the position that the severability clause in Paragraph 6.2 of the Special Warranty Deed could not lawfully be interpreted to give either party more than it bargained for in the original agreement, and that the severability clause could not operate to give the City or the public an unrestricted easement because the parties specifically intended otherwise. In other words, the Church claimed that the Pedestrian Easement was void, and in any event should be

---

[8] While the general events relating to this controversy are not disputed, the characterization of those events is subject to significant disagreement depending on one's perception. The court has attempted to strip the hyperbole from Plaintiffs' allegations while bearing in mind that, in considering the Defendants' Motions to Dismiss, the well-pleaded facts in the Third Amended Complaint must be construed liberally in a light most favorable to Plaintiffs and that the court must resolve all reasonable inferences in Plaintiffs' favor.

11

vacated so the Church could constitutionally regulate the use of the Plaza property in accordance with the original intent of the parties.

On the other hand, representatives of the City took the position that, as a result of the severability clause in Paragraph 6.2 of the Special Warranty Deed, the Pedestrian Easement remained in effect without the unconstitutional limitations on First Amendment activities set forth in the Special Warranty Deed.  Mayor Anderson, the person responsible for implementing the decision in *Main Street I* and enforcing the terms of the original Special Warranty Deed, initiated a widely publicized campaign to protect the public's interest in the Plaza and to deflect criticism from the LDS Church and others regarding the Tenth Circuit's decision.

During the ensuing months, Mayor Anderson and the LDS Church engaged in a vitriolic and widely reported dispute that, according to the Mayor, threatened to tear the City apart along religious lines.  Plaintiffs allege numerous examples of the Mayor's statements indicating his unwillingness to relinquish the Easement, stating that "it would be a betrayal" of the public's interest to relinquish the Easement.[9]  For example, Plaintiffs allege that the Mayor was quoted as saying, "If [a candidate for mayor] promised to return [the Easement to the Church,] they would get 5% of the vote.  Even LDS Church members would see through that–No. 1 as pandering, and No. 2 as being completely unethical."  Plaintiffs claim that this particular statement is representative of the Mayor's many other statements and acts that place his later

---

[9] These allegations are based on media reports, the Mayor's own press releases, materials posted on the City's website, City publications, and official transcripts of City proceedings.  For purposes of the Motions to Dismiss, the court has accepted these alleged statements as true.

actions in context and raise serious questions about how and why the Church was given control over the Plaza. On October 22, 2002, Mayor Anderson released an eight-page statement rejecting the LDS Church's proposals to abandon the Easement. In an announcement accompanying the release of his statements, the Mayor stated that the City would instead draft restrictions on conduct and speech for the Easement, "but ones that do not protect the Church from competition or expression it finds offensive." In his eight-page written statement, the Mayor explained that he was "faced with the decision as to whether (1) Salt Lake City should simply transfer the easement to the [LDS Church] so the contemplated restrictions can be given effect, (2) Salt Lake City and the [LDS Church] should attempt to restructure the transaction in a manner that would give effect to the essential elements of the agreement reached between them, including assured public access and the restrictions on expressive activities, or (3) Salt Lake City should simply act according to the terms of the Special Warranty Deed, and, according to the opinion of the Tenth Circuit, formulate reasonable, content-neutral restrictions as to time, place, and manner that will conform to the requirements of the Constitution."

The Mayor concluded that, "[b]ased on the fundamental ethical principle that parties to an agreement should, to the extent possible, give effect to the promises each party made to the other, and based on the commitments of the City Council and the [former Mayor's Administration] to the community as a whole, I am compelled to retain the easement on behalf of Salt Lake City, and proceed according to the terms of the Special Warranty Deed (except those that have been held by the court of appeals to be unconstitutional), and work with the Salt lake City Council to formulate constitutionally permissible time, place, and manner restrictions

13

regarding conduct and other expressive activities on the Main Street Plaza." Mayor Anderson stated that "to simply convey the easement to the [LDS Church] would . . . violate that principle" and "would be a betrayal of the interests of Salt Lake City and of the public."

In its public relations campaign, the LDS Church distributed information packets to leaders of other faiths, business leaders, community council members, and many others in Salt Lake and Davis Counties. One of the brochures is titled *Realizing a Vision - the New Church Plaza.*[10] The materials distributed by the Church included a letter from LDS Church President Hinckley describing how the LDS Church had dedicated the Plaza as a place to contemplate God and not as a place for "confrontational and noisy demonstrations." President Hinckley explained that "the Prayer of Dedication included a plea that the Plaza be seen as a place of peace–an oasis in the midst of this bustling city–an island of quiet beauty where the weary may sit and contemplate the things of God and the beauties of nature." The President's letter to the public was subsequently printed in Salt Lake City's two major daily newspapers.

The City Council took steps to determine whether it had the authority to rewrite the terms of the original deed and relinquish the Pedestrian Easement. It authorized funds and eventually hired its own attorney for this purpose. Then-Council Chair Buhler and Councilman Jergensen

---

[10] Plaintiffs allege that the title of this brochure was carefully chosen to convey the LDS Church's belief that God, through his "Prophet," LDS President Gordon Hinckley, has endorsed the Church's position on the Plaza controversy. Thus, Plaintiffs assert, when President Hinckley speaks to Church followers, he speaks not only with the authority of God, but God purportedly speaks directly through him by revealing "visions." In addition, Plaintiffs add, questioning the edicts of LDS authorities is viewed as subversive, and dissent is not tolerated and is considered heretical. They claim that a familiar axiom in the LDS Church community is that "[w]hen the Prophet speaks, the debate is over."

issued public statements critical of the Mayor's decision and supportive of the LDS Church's opinion. The City Council's actions sparked a widely publicized dispute between the Mayor and the individual Council members, including charges by some members of the City Council regarding the Mayor's religious bias, and the Mayor's countercharges of religious bias against the all-LDS City Council. According to Plaintiffs, the Mayor's countercharges carried special weight in Salt Lake City because of the perception that the LDS Church controls the process of government. In widely published reports, Mayor Anderson often repeated his allegations of bias and defended his position as the more "objective voice in the dispute because the seven-member all-LDS City Council has vast conflicts of interests."

In a subsequent address before the City Council, the Mayor chastised the Council for taking the "extraordinary measures" to aid the Church. The Mayor stated that it was "very clear to this community" that the Council would not have taken such steps to deprive the community of the right of access to the Plaza if it was owned by someone other than the LDS Church. He also objected to the LDS Church public relations campaign, which he described as bringing unfair "pressure to bear" on the all-LDS Council. In widely published reports, including an article in *The New York Times*, the Mayor rebuked the LDS Church for the rancor and mistrust the Plaza controversy was creating along religious lines. Mayor Anderson was quoted as stating that "[t]he impact on the City has been horrendous," and he blamed the LDS Church for the controversy: "My job is to do the right thing. To ask me to convey that easement from the City to the LDS Church would be a huge betrayal to the people in the community."

According to Plaintiffs, on November 26, 2002, the Mayor released an open letter,

15

published by the *Deseret News*, which they claim made the clearest case for not surrendering the

Pedestrian Easement:

> That easement was crucial to the city at the time of the initial deal. The Court of Appeals noted as follows: "While the City wanted to close the street to automobile traffic, it simultaneously wanted to preserve and indeed encourage pedestrian traffic. The easement through the plaza was specifically retained in order to preserve and enhance the pedestrian grid in the downtown. . . . [T]he easement was a necessary means of accomplishing these public purposes. . . . [T]he pedestrian easement was central to these goals. . . . [T]he City has contended throughout this litigation that the City would not have agreed to the sale "but for" the easement.

> Now that the Court of Appeals has ruled that the restrictions are unconstitutional, many people seem eager--even demanding (some of them very rudely)--that I violate the terms of the written agreement and betray the promises that were made to this entire community about the "crucial" public pedestrian easement. They call upon me to convey the easement to the Church of Jesus Christ, contrary to the written agreement and the public promises. Some who have made those demands have done so with righteous indignation that I would abide by the written agreement that was negotiated at length and drafted with the help of several lawyers representing The Church of Jesus Christ and the City. Ironically, I am being criticized by officials of The Church of Jesus Christ and [former Mayor] Deedee Corradini for refusing to significantly alter a contract negotiated, drafted, and signed by them. . . .

> If we are going to live up to our word--if we are going to abide by our promises--if we are going to comply with our written commitments--then we must let the written agreement signed on behalf of The Church of Jesus Christ and the [C]ity control the outcome of the Main Street Plaza situation. The parties agreed what would occur if a court deemed the restrictions to be unconstitutional. To change that written agreement, and to betray the promises to our community about the "crucial" pedestrian easement, would be wrong. If the City Council were to find a way to break those promises and destroy the public's legal right of access, those who oppose the conveyance of the easement would be well entitled to ask if agreements--if promises--mean anything anymore. And they would be entitled to ask just why some members of the City Council went to such great lengths to undermine the public interest when the religious organization to which they belong is the party insisting that the written agreement be significantly altered. For a principled outcome, we must apply the controlling ethical

principles consistently, regardless of who the parties to the transaction are . . . .

On December 6, 2002, the Mayor released his proposal for regulating speech on the Plaza. The plan adopted by the Mayor narrowly defined the Pedestrian Easement and contained detailed regulations that were more extensive than those governing other public streets and sidewalks. The proposal limited the City's existing legal claim to a narrow strip on the East side of the Plaza (farthest from the LDS Church's Temple) and confined demonstrations to two designated areas at the North and South ends of that narrow strip. Leafleting would be permitted along the narrow strip under the Mayor's proposal.

The next day, according to Plaintiffs, attorneys for the LDS Church delivered a letter to the Mayor and members of the City Council rejecting the Mayor's plan and reiterating the Church's position that the City should surrender the Easement. "This community needs your help," wrote Presiding Bishop H. David Burton, "[w]e respectfully submit that there is a way to resolve this perplexing problem: The easement must be extinguished." Plaintiffs contend that, despite the LDS Church's ongoing campaign to pressure the Mayor into abandoning his proposal, Mayor Anderson remained adamant in his commitment to preserve the Easement on behalf of the public.

Sometime between December 6 and December 16, 2002, the Mayor formulated a compromise. Plaintiffs characterize this change of heart as an "eleventh hour decision to change horses and relinquish the easement" and occurring "under the most unusual circumstances," i.e., surrendering to the significant pressure brought to bear on him by the LDS Church. In contrast, the City and the LDS Church characterize the proposal as an attempt by the City, the LDS

17

Church, and many others in the community to seek an acceptable solution to avoid further litigation concerning the validity of the Pedestrian Easement, to bring an end to the divisiveness in the community, and to secure a significant benefit for the City.

On December 16, 2002, the Mayor, in conjunction with the Alliance for Unity and James L. Sorenson, proposed a settlement (the "Settlement Proposal" or "Proposal") that generally involved an exchange of the Easement for 2.125 acres of LDS Church-owned property in the Glendale neighborhood of the City, payment of half the City's obligation to pay attorneys' fees in *Main Street I*, and $5 million in cash from the Alliance for Unity. James Sorenson pledged $1 million in cash and land toward this $5 million goal, and the LDS Church also agreed to contribute an unspecified amount to the goal. The Mayor proposed that the land and cash be used for construction of community facilities in the Glendale neighborhood, home to many families of modest means.

In exchange for the foregoing consideration, the Mayor proposed that the Easement be completely extinguished and that Main Street Plaza would become entirely private. The Settlement Proposal specifically provided that following extinguishment of the Easement, the public would have no rights to access or pass across the Plaza.[11] The LDS Church, as the owner

---

[11] Plaintiffs allege that the LDS Church "gave repeated assurances that public access would not be interfered with–subject only to the Church's resurrected right to exclude protestors, which the Church has been granted under the terms of the original sale." They claim that the right of access promised by the LDS Church was a key consideration for the Mayor. The assurances given by the Church that the public would continue to have access were repeated many times through[out] these negotiations, until and including the date on which the final transaction closed." *See* Third Am. Compl. ¶ 50. The Defendants, in their memoranda opposing Plaintiffs' Motion for a Preliminary Injunction, dispute these allegations. However, even if this court accepts Plaintiffs' allegations as true for purposes of the Motions to Dismiss, these

in fee, would determine if and when to allow the public on the Plaza, and it would have the absolute right to deny access to any person.

## E. THE PUBLIC PROCESS

On January 8, 2003, the Mayor filed Petition 400-03-01 with the Salt Lake City Planning Commission to close, vacate, and abandon the Pedestrian Easement pursuant to the terms and conditions outlined in the Settlement Proposal. The City then held a series of community council meetings and City advisory board meetings to consider the Mayor's Proposal. At these meetings, which occurred during the spring of 2003, representatives of the Mayor's office made

---

allegations do not preclude dismissal of their claims, as discussed below. Regardless of what assurances may have been made prior to the final transaction, the Settlement Agreement contains an integration clause, which belies and is fatal to Plaintiffs' allegations to the contrary. In particular, the Settlement Agreement states that it

> is complete and integrated, and constitutes the entire understanding between the Parties with respect to the subject matter contained herein and supersedes all previous and contemporaneous agreements, understandings, promises, warranties, representations, inducements or conditions, oral or written, except as contained herein. The express terms hereof control and supersede any course of performance inconsistent with any terms hereof. Any revisions, amendments or modifications to this Settlement Agreement must be in writing and signed by all Parties hereto. Any implied and/or oral revisions, amendments or modifications will not be binding on any of the Parties.

Settlement Agreement at 8, ¶ 10(c); *see also* Amended Deed ¶ 2(d). Furthermore, the Settlement Agreement states that

> [t]he Parties each represent and acknowledge that, in executing this Settlement Agreement, they do not rely and have not relied upon any representation or statement made by each other (except as expressly set forth in the recitals in this Settlement Agreement) or by any agents, representatives, or attorneys of the other with regard to the subject matter, basis, or fact of this Settlement Agreement, or otherwise.

Settlement Agreement at 8, ¶10(a).

19

detailed presentations to the community councils and community organizations, and the following community groups approved the Mayor's Proposal: Downtown Alliance, Capitol Hill Community Council, West Side Salt Lake Community Council, Chamber of Commerce, Greater Avenues Community Council, Central City Community Council, and People's Freeway Community Council.

During this time period, the City created a website to provide information to the public about the Mayor's proposal, to provide transcripts of the "Question and Answer" segments of the community council meetings, and to receive additional public comment.

On February 27, 2003, the Salt Lake City Transportation Division prepared a Pedestrian Impact Study of Part-Time or Full-Time Closure of the Main Street Plaza to Pedestrians (the "Pedestrian Impact Study"). On March 23, 2003, the Salt Lake City Transportation Advisory Board voted to support the Mayor's Settlement Proposal, concluding in part that the impact on pedestrian traffic would be minor, based in part on the Pedestrian Impact Study.[12]

On April 9, 2003, the City Planning Staff issued its report on the Mayor's Settlement Proposal, recommending that the Planning Commission recommend to the City Council that, among other things, the Pedestrian Easement be extinguished and the donation of the Glendale Property be accepted by the City. Following public comment the same day, the Planning Commission voted four to three against following the Planning Staff recommendation.

In advance of the City Council's consideration of the Mayor's proposal, attorneys for the

---

[12] Plaintiffs allege, however, that the "traffic impact study's conclusion is both implausible and completely misleading." Third Am. Compl. ¶ 55. Even if the court accepts Plaintiffs' allegation as true, it is irrelevant to the court's legal analysis below.

20

City, the LDS Church, the Alliance for Unity, and James L. Sorenson negotiated draft agreements for the City Council's consideration. Those draft agreements were made public by the City and posted on the City's website in advance of public hearings on the Mayor's Proposal.

As part of its due diligence for the proposed transactions, the City Attorney's Office commissioned independent appraisals of the market value of the of the Pedestrian Easement and the Glendale Property by Phillip Cook & Associates. These appraisals demonstrated that implementation of the Mayor's Settlement Proposal would result in the City's receiving consideration worth more than ten times the value of the Easement. Plaintiffs have previously acknowledged that the Easement was appraised at $500,000. The LDS Church-owned land in the Glendale neighborhood was appraised at a value of $275,000. In addition to the Glendale land, the City was to receive cash and land from the Alliance for Unity and James L. Sorenson having a value of more than $5 million. Of this total, the LDS Church was to donate $250,000 in cash. Pursuant to the Mayor's Proposal, the Church was also to pay $104,836.66 toward the City's obligation to pay attorneys' fees to the prevailing plaintiffs in the *Main Street I* case. In short, the City received cash and land valued at more than $5.375 million for the Pedestrian Easement, which was valued at $500,000.[13]

**F. APPROVAL BY THE CITY COUNCIL**

The City Council held public work sessions concerning the Mayor's Proposal on May 27, May 29, and June 3, 2003, and a held public hearing for comment and discussion on June 3,

---

[13] Plaintiffs do not allege that the consideration given was inadequate, but rather that the "value of the Easement" was "intentionally understated." Third Am. Compl. ¶ 51. Thus, this allegation is not fatal to Defendants' Motions to Dismiss.

2003, which hearing was continued to June 10, 2003. The City Council heard comments from numerous citizens during the Public Comment segment of the City Council meetings and received many other written and oral comments from citizens. The City Council specifically considered the draft settlement agreements from the City, the LDS Church, the Alliance for Unity, and Sorenson. Following the conclusion of the public hearings, on June 10, 2003, the members of the City Council voted in favor of the Mayor's Settlement Proposal six to zero, with one abstention.

Ordinance No. 31 of 2003 (the "2003 Ordinance") cites many of the purposes that would be advanced and many of the benefits the City would obtain by adopting the Mayor's Proposal. It states that "the Settlement Proposal is consistent with the City's primary objective in entering into the original transaction: the promotion of tourism and economic development." In addition, in the 2003 Ordinance, the City Counsel also made the following findings:

(1) if, following completion of the transaction, the [Church], as private owner of the Main Street Property, decides to close the Main Street Property to pedestrian access and passage, the impact on pedestrian traffic would be minor;

(2) the City never intended in the original transaction that expressive activities would be preserved on the Main Street property;

(3) the Court of Appeals decision has left the City with an unintended responsibility to regulate protected expressive activities on the Main Street Plaza, with the attendant risk of litigation;

(4) even after the closure, vacation and abandonment of the Pedestrian Easement and resulting closure of the public forum on the Main Street Property, there will be ample alternate public forum space available for protected expressive activities in the immediate vicinity of the Main Street Property along North and South Temple Streets as well as in other areas of the City;

(5)    during 1998, the year prior to the original transaction, no free speech permits were requested from the City for the Main Street sidewalks between North and South Temple Streets;

(6)    the continued existence of the Pedestrian Easement is not necessary for use by the public as a sidewalk or pedestrian thoroughfare and closure, vacation and abandonment of the Pedestrian Easement will not be adverse to the general public's interest;

(7)    there is a good faith dispute between the City and the Corporation of the Presiding Bishop over the impact of the Court of Appeals' decision on their original agreement;

(8)    the controversy over the impact of the decision by the Court of Appeals on the original agreement between the City and the Corporation of the Presiding Bishop has had an extremely divisive and harmful effect on the Salt Lake City community;

(9)    the donation of the Glendale Property by [the Church] and the donations by the Alliance for Unity and James L. Sorenson will enable the City to construct new and expanded facilities that will provide significant benefits to the community;

(10)    the benefit of new community facilities in Glendale, promotion of tourism, resolution of divisiveness in the community, and voluntary settlement of the legal dispute between the City and the Corporation of the Presiding Bishop provide sufficient public policy reasons for the closure, vacation and abandonment of the Pedestrian Easement, and the closure of the Pedestrian Easement will enable the City to accomplish those public policy purposes;

(11)    the accomplishment of these public policy purposes through closure, vacation and abandonment of the Pedestrian Easement outweighs the benefits of any alternatives to the closure of the Pedestrian Easement; [and]

(12)    there is good cause for the closure, vacation and abandonment of the Pedestrian Easement and such action will not be detrimental to the public interest;

. . . .

2003 Ordinance at 8-10.

The 2003 Ordinance conditioned the vacation of the Easement upon the parties' execution of the Settlement Agreement and the Deed Conveying Easement Rights and Amendment to Special Warranty Deed (the "Amended Deed"), instruments that were intended to formalize the Mayor's Proposal.  On June 19, 2003, shortly after the City Council passed the 2003 Ordinance, the Church and the City executed the Settlement Agreement.  Among other things, the Settlement Agreement provides for the vacation of the Easement in exchange for consideration of land and cash in a total sum of over $5 million, as presented in the Mayor's Settlement Proposal.

Specifically, the Settlement Agreement provided, among other things, that the LDS Church would convey 2.125 acres of property (the "Glendale Property") located at 1385 South 900 West, Salt Lake City Utah, it would provide additional consideration equaling (a) two hundred fifty thousand dollars ($250,000) through the Foundation's contribution to the Alliance for Unity; and $104,586 in attorneys' fees for the *Main Street I* litigation.  In addition, the Alliance for Unity would provide to the City a total of at least Four Million Dollars ($4,000,000) for construction of the Community Facility and, at the City's discretion, for furnishings, fixtures, and equipment for, and maintenance of the facility.  James L. Sorenson agreed to donate to the City cash and/or land having the value of at least One Million Dollars ($1,000,000) for the same purposes.  *See* Settlement Agreement, attached as Addendum 1 to the City's Mem. in Supp. of Mot. to Dismiss Third Am. Compl.

The Settlement Agreement, among other things, also provided that the City would close, vacate, and abandon and convey to [the Church] the Pedestrian Easement.  It further states that

24

"the City will own no interest whatsoever in the Main Street Plaza property except those interests arising from [the Church's] obligation to use and maintain the Property as a landscaped space and the easements for emergency and public safety services and public and private utilities and the view corridor and fencing restrictions. The City "also disclaim[ed] any right or authority to regulate any expression or conduct on the Property other than pursuant to [the City's] police powers applicable to private property in general."

The Settlement Agreement also amended the 1999 Special Warranty Deed, among other ways, as follows:

(1)    Provisions regarding the Easement and regulating conduct on the Easement were deleted in their entirety.

(2)    A provision was added concerning the right of public access on the Property after the vacation of the Easement:

> No Right of Public Access–It is the intent of the Parties to eliminate any right of public access or passage enforceable by the City or by members of the public in relation to the Main Street Plaza Property, and nothing in this Settlement Agreement should be construed otherwise. The Parties do not intend to create any obligation, promise, dedication, servitude, or easement of any kind that would require the [LDS Church] to permit public access or passage.

(3)    A provision was added to protect the view corridor: "To ensure the preservation of the view corridor . . . and the aesthetics of the Property and surrounding areas, [the Church] may not erect fences, walls, or gates on the Property without written approval of [the City], which approval shall not be unreasonably withheld. [The City's] approval authority shall be exercised based on "aesthetic, safety, and security" considerations and the need to preserve that

25

view corridor . . . and not on concerns about public access." This provision also states that if a court of competent jurisdiction holds that this provision creates or establishes the basis for a First Amendment forum of any kind, the requirement that the Church must obtain approval from the City to erect fences, walls, and gates shall automatically terminate and be of no further force or effect.

(4)     A provision was added granting the City the right of re-entry if the Church fails to maintain the Plaza as a landscaped space, fails to allow the City access to the Plaza for the utility and public safety service easements, or fails to comply with the view corridor or fencing restrictions. The provision states that it shall not be interpreted to create or establish the basis for a First Amendment forum.

(5)     A provision was added stating that the "parties expressly intend and agree that the Property be private property and that [the Church] shall have full, complete and absolute control over all activities on and uses of the Property" and that if the right of re-entry creates a First Amendment forum, it shall automatically terminate.

On Monday, July 28, 2003, after waiting the thirty-five day period prescribed in the Settlement Agreement, the City and the Church closed the transaction. The LDS Church executed a Special Warranty Deed conveying the Glendale Property to the City, and the Alliance for Unity and James Sorenson transferred funds and land to the City. In exchange, the City vacated the Easement by executing the Amended Deed.

## G. THE INSTANT LAWSUIT–*MAIN STREET II*

On August 7, 2003, Plaintiffs filed the instant action. On August 20, 2003, Plaintiffs

filed an Amended Complaint. The City Defendants responded with a Motion to Dismiss the Amended Complaint. After a hearing was set on the motion to dismiss, the parties agreed that rather than moving forward on the motion to dismiss, Plaintiffs would file a Second Amended Complaint. Accordingly, Plaintiffs filed a Second Amended Complaint on October 8, 2003. In the Second Amended Complaint, Plaintiffs did not name Mayor Anderson as a defendant. On November 5, 2003, the LDS Church moved to intervene as a Defendant. On that same date, the City again filed a Motion to Dismiss, this time on substantive grounds. On November 7, 2003, Plaintiffs filed a Motion for Preliminary Injunction, a motion to expedite discovery, and a motion for an expedited hearing.

On November 17, 2003 the City filed a Motion for Protective Order. On November 19, 2003, the court held a scheduling conference and granted the LDS Church's Motion to Intervene. Just prior to the November 19, 2003 scheduling conference, Plaintiffs informed the court that they would be seeking leave to file a Third Amended Complaint. At the November 19, 2003 scheduling conference, the court granted the request. The court set a hearing for December 5, 2003 on the City's Motion for Protective Order and Plaintiffs' Motion for Expedited Discovery. The court also set a January 26, 2003 hearing on the City's Motion to Dismiss and indicated that the court would decide at the December 5, 2003 hearing whether the preliminary injunction hearing would proceed at the same time, in light of the discovery sought by Plaintiffs.

On November 20, 2003, the LDS Church filed a Motion for Protective Order, which was similar to the City's previously filed motion. On December 2, 2003, Plaintiffs filed the Third

Amended Complaint, which, among other things, renamed Mayor Anderson as a Defendant.[14] On December 5, 2003, the court heard oral argument on Defendants' Motions for Protective Orders and on Plaintiffs' Motion for Expedited Discovery.   The court took the issues under advisement, and, on December 10, 2003, just minutes before the court was going to issue its Order, the parties called to inform the court that they had reached a stipulation (the "Stipulation") regarding the discovery disputes, and thus requested that the court not rule on the pending motions.

In their Stipulation, the parties agreed that the LDS Church would make Bishop Burton, or his designee, available for a deposition, which would last no longer than one-half day.  The City agreed to make Mayor Anderson available for a half-day deposition, and Defendants agreed not to oppose any attempt by Plaintiffs to take the deposition of Jon M. Huntsman, which would last no longer than one-half day.  The Stipulation also permitted Plaintiffs to serve Defendants with a request for production of documents pursuant to Rule 34 by December 16, 2003, and Defendants would respond by January 5, 2004.  Defendants were permitted to take the depositions of any of the Plaintiffs or any person for whom Plaintiffs submit an expert report or declaration.  The Defendants also agreed not to object to Plaintiffs' request to take the depositions of not more than two newspaper reporters regarding quotations they attributed to Mayor Anderson.[15]  The parties agreed that they would take no other discovery in relation to the

---

[14]  The Third Amended Complaint, filed on December 2, 2003, is the operative pleading in this action.

[15]  Plaintiffs issued subpoenas to Heather May of *The Salt Lake Tribune* and to Brady Snyder of the *Deseret Morning News*.  The reporters, through counsel, moved to quash the

28

pending Preliminary Injunction Motion.

Pursuant to the Stipulation reached by the parties, the court issued an order permitting Plaintiffs to supplement their Motion for a Preliminary Injunction after they had completed discovery. The City Defendants and the LDS Church then filed Motions to Dismiss the Third Amended Complaint on December 18, 2003 and December 19, 2003, respectively.

Plaintiffs filed their renewed Motion for Preliminary Injunction on January 13, 2004. After expedited briefing, on January 26, 2004, the court heard argument on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motions to Dismiss, along with various motions to strike. The court took the issues under advisement, and, as indicated above, Plaintiffs continued to submit supplemental authority, as well as further argument, to the court during the following month, prompting Defendants to respond.

## H. SUMMARY OF PLAINTIFFS' ARGUMENTS

Plaintiffs allege that the sale of the Pedestrian Easement did not result from an arms-length negotiation. Rather, "[i]t resulted from undue influence exerted by the LDS Church and was made in the context of claims of bias, betrayal, and conduct by the Church, which was alleged by the Mayor himself, to be unethical, unprincipled, divisive, and unconstitutional." Third Am. Compl. ¶ 51. They further allege that "[t]he Mayor also understood that his decision would be perceived by the public as pandering to the LDS Church and would reinforce the non-LDS community's distrust of and cynicism about the influence of the LDS Church on the affairs

---

subpoenas, and an expedited hearing was set for January 13, 2004. Prior to January 13, 2004, and for reasons that are not contained in the record, the parties notified the Magistrate Judge that the hearing was no longer necessary.

29

of government." *Id.* They claim that the relinquishment of the Easement is "nothing more than a façade for viewpoint discrimination and [a] transparent effort to circumvent the Court of Appeals' decision in *Main Street I*." *Id.* ¶ 60. Thus, they contend, "[b]ecause of Main Street's historic and symbolic importance as the center of civil life, the transfer of the Plaza to the LDS Church conflates the role of government and Church in a way that would lead a reasonable observer to believe that the Church occupies the position of power and influence over government in Salt Lake City." *Id.* ¶ 61.

They claim that, rather than assume its constitutional obligation to regulate this quintessential public space pursuant to reasonable content-neutral time, place, and manner regulations, "the City acquiesced to the LDS Church's demands that the City abandon the easement, and thus it created an exclusive and uniquely powerful platform for the Church to promulgate its message on a range of social, political, and religious issues, while prohibiting [P]laintiffs and others from sharing their own messages on the same issues in the same place and in the same manner." *Id.* ¶ 61.

Specifically, Plaintiffs claim that Defendants violated Plaintiffs rights to freedom of expression and assembly under the First and Fourteenth Amendments to the United States Constitution. They contend that the Plaza remains a quintessential public forum, and the City and/or the LDS Church are constrained by the First Amendment from unreasonably interfering with First Amendment rights on Salt Lake City's Main Street. To the extent that the police power over Main Street has been delegated to the LDS Church, Plaintiffs claim that the Church has assumed the mantle of government and is subject to First Amendment limitations.

30

Plaintiffs further allege that the City's actions violate the Establishment Clause because those actions (a) have the purpose and effect of promoting religion, and, in this case, a particular religion; (b) impermissibly entangle church and state by giving the Church authority over an open-space pedestrian plaza in the heart of downtown Salt Lake City; and (c) impermissibly endorse religion by conveying a message to those who are not LDS that they are outsiders who are not full members of their political community.[16] Plaintiffs claim that the secular interests purportedly advanced by the transaction are a sham designed to deflect attention from the City's improper sectarian motives for entering into this agreement.

## I. SUMMARY OF DEFENDANTS' ARGUMENTS

By contrast, the City and the LDS Church have moved for dismissal of the entire action. Specifically, they claim that Plaintiffs' Free Speech claim must fail because the Plaza is now entirely private. They claim that it is no longer a public forum under the First Amendment, and the right of reentry is not a significant enough government property interest to trigger a public forum analysis. Moreover, they claim that the Tenth Circuit Court of Appeals specifically stated that the public forum created by the Easement could be eliminated by relinquishing the Easement to the Church.

In addition, they claim that Plaintiffs' Establishment Clause claim fails because Plaintiffs cannot meet their burden of demonstrating that the sale lacked secular benefits to the city or that the primary effect of the sale advanced or endorsed religion, or that it excessively entangled

---

[16] This claim is brought pursuant to the First and Fourteenth Amendments to the United States Constitution and Article I, Section 4 of the Utah Constitution.

government with religion.

The court will address each of these motions in turn.[17]

## II. PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs have requested that this court "enjoin the City from arresting or interfering with speakers engaging in First Amendment activity on Main Street Plaza."

### A. LEGAL STANDARD FOR OBTAINING A PRELIMINARY INJUNCTION

In order to obtain preliminary injunctive relief, the moving party must establish:

> (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) that the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) that the injunction is not adverse to the public interest.

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1177 (10th Cir. 2003); *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991). Because a preliminary injunction is an extraordinary remedy, "the right to relief must be clear and unequivocal." *See Visa*, 936 F.2d at 1098; *Dominion Video Satellite v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

Moreover, if a preliminary injunction alters the status quo, a plaintiff must "show that on balance the four [preliminary injunction] factors weigh heavily and compellingly in [its] favor." *O Centro*, 342 F.3d at 1177 (quoting *Visa*, 936 F.2d at 1099); *Salt Lake Tribune Publ'g Co., LLC*

---

[17] Because, as discussed below, the court grants Defendants' Motions to Dismiss, the court would not typically address the pending motion for a preliminary injunction because the ruling on the Motion to Dismiss renders the preliminary injunction motion moot. The court, however, seeks to explain not only why the action is dismissed, but why, even absent the dismissal, the court would not grant Plaintiffs' Motion for Preliminary Injunction.

*v. AT&T Corp.* 320 F.3d 1081, 1099 (10th Cir. 2003). In *Visa*, the court found that the status quo "is defined by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." *Id.* at 1100 (emphasis in original).

In the instant case, an injunction would alter the status quo–the LDS Church's private ownership and control of the Easement. Accordingly, the higher standard applies in this case. The court finds, however, that Plaintiffs have not satisfied even the usual "clear and unequivocal" standard for obtaining a preliminary injunction.[18]

## B. IRREPARABLE INJURY TO PLAINTIFFS

Irreparable harm is often presumed where a violation of First Amendment rights is shown. *See Community Comms. Co., Inc. v. City of Boulder*, 660 F.2d 1370, 1376 (10th Cir. 1981). As discussed below, however, Plaintiffs have not met their burden of demonstrating that their First Amendment rights have been violated. Moreover, Plaintiffs' delay in seeking an injunction undermines their argument that they will suffer irreparable harm if an injunction does not issue. Plaintiffs first became aware of the Mayor's Settlement Proposal on December 16, 2002. After Ordinance No. 31 of 2003 passed on June 10, 2003, Plaintiffs had the opportunity to challenge the City's action before the sale of the Pedestrian Easement. Danielle Eyer, Executive Director of the Utah Chapter of the ACLU, testified in her deposition that on July 7, 2003, three

---

[18] Obviously, in ruling on Plaintiffs' Motion for Preliminary Injunction, the court has considered the evidence submitted by the parties and has not relied merely on Plaintiffs' assertions. The court, however, has been careful not to consider the evidence offered in support of or in opposition to the preliminary injunction motion in considering Defendants' Motions to Dismiss.

weeks before the closing, the ACLU's Utah Board of Directors voted in favor of filing suit. Despite this decision, the ACLU decided to delay, apparently because of concerns that "the ACLU . . . was not interested in ruining a good project for the City." Ms. Eyer relayed these concerns to Plaintiffs' counsel. Even after the closing, Plaintiffs waited months to seek injunctive relief.

Any unnecessary delay in seeking relief "may be viewed as inconsistent with a claim that plaintiff is suffering great injury or, in the case of preliminary injunctive relief, that there is an urgent need for immediate relief and that a judgment would be rendered ineffective unless some restraint is imposed on defendant pending an adjudication on the merits." 11A Wright & Miller, *Federal Practice and Procedure* § 2946 at pp. 113-14 (1995). "[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least reduced need for such drastic, speedy action." *Citibank, N.A., v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

In this case, although the transaction closed on June 10, 2003, Plaintiffs did not file their Complaint until August 7, 2003. Yet, they did not request a preliminary injunction prior to the LDS Church's semi-annual General Conference in October 2003, and, although they claimed that they needed injunctive relief prior to the holiday season when many visitors would come to see the lights on Main Street Plaza and the Salt Lake Temple grounds, they did not file their motion for a preliminary injunction until November 7, 2003, a full three months after their Complaint was filed, and at the same time, requested leave to conduct expedited discovery,

34

which would be completed within thirty days.[19]

Notwithstanding Plaintiffs' alleged urgency, Plaintiffs then amended their Complaint again, with the operative Third Amended Complaint not being filed until December 2, 2003. Ultimately, after the parties reached a stipulation concerning the discovery that would be permitted, Plaintiffs were granted leave to supplement their preliminary injunction motion by January 12, 2004. After expedited briefing by the parties, the motion was fully briefed on January 23, 2004, and the court heard argument on January 26, 2004.

The court finds that Plaintiffs' delay belies any irreparable injury to their rights. Further, Plaintiffs have ample alternative sites in the immediate vicinity on which to express their First Amendment rights. The City sidewalks run perpendicular to each end of the Plaza, and thus the issue of whether Plaintiffs can demonstrate on the Plaza is largely academic because the precise location of their protests will not impact their ability to communicate their messages. Indeed, the City has provided evidence that nearly all of the demonstrations against the Church before construction of the Plaza occurred on the City sidewalks on North Temple or South Temple, and not on the block of Main Street that is now covered by the Plaza. *See* Alexander Decl. ¶¶ 14, 31. Denying injunctive relief would result in an extremely minor reduction in the amount of space available for free-expression activities near the LDS Church Campus. "The First Amendment does not guarantee an optimal setting for speech at all times and places." *Hale v.*

---

[19] Because Plaintiffs knew that Defendants would be entitled to respond to both the motion to conduct expedited discovery, and, assuming that such a motion would be granted, the motion for a preliminary injunction, it is unclear to the court how Plaintiffs could have believed that their preliminary injunction motion could have been heard, let alone ruled on, prior to--or even during--the holiday season.

*Dep't of Energy*, 806 F.2d 910, 918 (9ᵗʰ Cir. 1986).

Finally, the irreparable harm presumption does not attach because, as discussed below, Plaintiffs have not demonstrated a substantial likelihood of success on the merits. Accordingly, the court finds that Plaintiffs will not suffer irreparable harm if the injunction is not granted.

## C. BALANCE OF HARMS

The LDS Church paid millions of dollars to purchase the Plaza property in order to create a peaceful venue that would unify its headquarters campus and become an integral part of Temple Square and the Church Administration Block. In the wake of *Main Street I*, however, Main Street Plaza became a magnet for protest, the venue of choice for those wishing to publicly insult the Church and its members. Between October 9, 2002, when the Tenth Circuit's decision was issued, and July 28, 2003, when the Church's settlement with the City closed, noisy and offensive protest became a regular occurrence on Main Street Plaza. In his affidavit, Bishop Burton has provided the court with examples of these protests. He testified that the protestors were so noisy that "their shouting could be heard and would cause disruption in the sacred rooms of the Temple and in other Church buildings around the Plaza." Affidavit of H. David Burton ("Burton Aff.") ¶¶ 48-49. Further, he testified that "the serenity of the Plaza will be destroyed during those periods in which protestors are present." *Id.* ¶ 58(d). If the injunction is granted, the court finds that, rather than a place of tranquility, the Plaza will become a scene of turmoil, and the Church will not have control of its property, for which it paid millions of dollars.

Moreover, an injunction would plunge the City back into the significant controversy it experienced after the Tenth Circuit's decision in *Main Street I*. Such an injunction would

36

necessarily require the City and the LDS Church to resolve their dispute regarding the continued existence of the Easement after *Main Street I*, the very dispute that resulted in the instant litigation. And, assuming that the Pedestrian Easement was–perhaps after further litigation–determined to exist, the City and the Church then would have to resolve the actual location of the Easement on the Plaza, devise time, place, and manner restrictions, and then likely face further litigation over such restrictions.

In contrast to these significant harms to the City and the LDS Church, Plaintiffs will be inconvenienced by having to move the site of their protests to a nearby public sidewalk. Their voices are not in danger of being silenced, only relocated. They will still have access to the people entering the Plaza.[20]

Accordingly, the court finds that the balance of hardships strongly favors the Defendants in this action.

## D. PUBLIC INTEREST

To grant the preliminary injunction would be adverse to the public interest for many of the reasons mentioned above pertaining to the harm that the City would suffer as a result of an injunction. The City would almost certainly be thrust back into further litigation, at taxpayers'

---

[20] Notably, from October 18, 2002 to April 9, 2003, only three free speech permits were issued for free expression activities on the Main Street Plaza. Forty-four permits were issued for free expression activities in other areas of the City during the same period. Also, in 1998, prior to the LDS Church's purchase of the Main Street Plaza, no permits were issued for either side of Main Street between North Temple and South Temple Streets. In contrast, 52 permits were issued for other areas of the city. *See* Mem. from Russell Weeks to City Council Members dated May 23, 2003, attached as attachment B to Ex. 2 of the City's Mem. in Opp'n to Mot. for Prelim. Inj.

expense.   The "public interest in prompt and efficient settlement of the City's [property] disputes is obvious" and clearly weighs in favor of denying the injunction.  *Sperry Corp. v. City of Minn.*, 680 F.2d 1234, 1238 (8th Cir. 1982).  Further, to grant an injunction would undermine the public process by nullifying the decision of the City's elected officials.  The process to resolve the Plaza dispute was extensive, time consuming, very public, and often wrenching and divisive.  A compromise was reached through democratic means, and it would not be in the public interest to set this process aside.

Thus, Plaintiffs have failed to meet their burden to show, clearly and unequivocally, that it would not be adverse to the public's interest to grant the injunction.

## E. LIKELIHOOD OF SUCCESS ON MERITS

Plaintiffs have not satisfied their burden of demonstrating a substantial likelihood of success on the merits.  Indeed, they have not demonstrated any likelihood of success on the merits because, as discussed in detail below, they have not stated a claim for any violation of their First Amendment rights.

## F. SUMMARY REGARDING MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs have not demonstrated that their entitlement to relief is clear and unequivocal, much less that "on balance the four [preliminary injunction] factors weigh heavily and compellingly in [their] favor."  *O Centro*, 342 F.3d at 1177 (quoting *Visa*, 936 F.2d at 1099); *Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.* 320 F.3d 1081, 1099 (10th Cir. 2003).

Plaintiffs have not satisfied even one of the four elements required to obtain injunctive relief.[21]

Accordingly, their request for a preliminary injunction is denied.

### III. DEFENDANTS' MOTIONS TO DISMISS

#### A. STANDARD OF REVIEW

In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court

must determine whether the factual allegations in the complaint, if true, would entitle the

plaintiff to a legal remedy. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Dismissal is

appropriate only when "the plaintiff can prove no set of facts in support of the claims that would

entitle him to relief . . . ." *Cottrell, Ltd. v. Biotrol Int'l, Inc.,* 191 F.3d 1248, 1251 (10th Cir.

1999); *see also Seamons v. Snow,* 84 F.3d 1226, 1231 (10th Cir.1996). "The court's function on a

Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but

to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which

relief may be granted." *Sutton v. Utah Sch. for the Deaf and Blind,* 173 F.3d 1226, 1236 (10th

Cir. 1999) (internal quotations and citation omitted). The court must accept all well-pleaded

facts as true, construe those facts liberally in a light most favorable to the plaintiff, and "resolve

all reasonable inferences in plaintiff's favor." *Seamons,* 84 F.3d at 1231-32. However,

---

[21] Moreover, even if Plaintiffs had met their burden on the four factors, their request for an injunction is overbroad–and therefore unworkable–in at least two respects: First, even if this court found that a public forum existed on Main Street Plaza, the public forum would be limited to the Pedestrian Easement and would not be co-extensive with "Main Street Plaza" in its entirety. Thus, the location of the Easement would still need to be determined. In addition, Plaintiffs ignore the fact that, even if a public forum existed, the City would be entitled to adopt reasonable time, place, and manner restrictions that would limit First Amendment activity on the Plaza. Thus, the court could not simply "enjoin the City from arresting or interfering with speakers engaging in First Amendment activity on Main Street Plaza."

conclusory allegations without supporting factual averments need not be accepted. *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 510 (10th Cir. 1998); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

## B. FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH AND ASSEMBLY

The First Amendment to the United States Constitution provides, in relevant part, that the government "shall make no law . . . abridging the freedom of speech . . . or of the right of the people peaceably to assemble." U.S. Const. amend. I. Plaintiffs claim that Defendants have violated Plaintiffs' rights to freedom of speech and assembly. Specifically, they contend that the City and/or the LDS Church are constrained by the First Amendment from unreasonably interfering with Plaintiffs' First Amendment rights on Main Street Plaza.

### 1.    Neither the Plaza Nor the Former Pedestrian Easement Is Government Property to Which First Amendment Forum Principles Apply

The LDS Church's $5.375 million acquisition of the Pedestrian Easement eliminated the last constitutionally significant government interest in Main Street Plaza. The Plaza is now entirely privately owned and maintained and thus beyond the reach of the First Amendment.

In arguing that their freedom of expression and assembly have been abridged, Plaintiffs assert that the Tenth Circuit found that the Plaza is a public forum to which First Amendment protections apply. The Tenth Circuit's determination, however, was limited to a finding that the Pedestrian Easement–not the entire Main Street Plaza–was a public forum.[22] The court first

---

[22] Indeed, the Tenth Circuit noted that "[p]laintiffs stated in the hearing on summary judgment that they were abandoning their claim that the *entire* plaza was a public forum and the district court accordingly ruled only on the easement." 308 F.3d at 1120 n.3 (emphasis in original).

40

concluded that "*[e]asements* are . . . constitutionally cognizable property interests." *Main Street I*, 308 F.3d at 1122-23 (emphasis added). The court then looked to the "actual purpose and use of the *easement*," whether the "*easement* had particular public importance for the City," whether "the pedestrian *easement* was central to [City] goals," and "whether speech activities were compatible with the purpose of the *easement*." *Id.* at 1126, 1128 (emphasis added). The court emphasized that "it is the purpose of the *easement*, the property that is a forum of some type, and not the purpose of the Church plaza, the surrounding property, that is at issue." *Id.* at 1128 (emphasis added). The Tenth Circuit then summarized its holding:

> In sum, the easement's history, as well as the other contemporary characteristics of the easement discussed above, support the conclusion that the easement is a public forum. The objective nature and purpose of the easement and its similarity to other public sidewalks indicate it is essentially indistinguishable from other traditional public fora. . . . Accordingly, we hold that the easement is a public forum.

*Id.* at 1131.

In short, the Plaza itself was never subjected to a First Amendment analysis, and it certainly never was found to constitute a public forum.[23]

Regarding the public forum status of the Pedestrian Easement, Plaintiffs appear to trivialize the significant events that have transpired since the Tenth Circuit found in *Main Street I* that the Easement constituted a public forum–namely that the City sold the Pedestrian Easement to the LDS Church for $5.375 million in land and cash. Accordingly, the Plaza is now

---

[23] To the extent Plaintiffs have attempted to resurrect their claim that the entire Plaza is a public forum, the court rejects such a claim for the same reasons that the court finds that the Pedestrian Easement is not a public forum.

41

entirely privately owned, unburdened by any constitutionally relevant property interest.[24]

Plaintiffs also fail to recognize that, in selling the Pedestrian Easement to the Church, the City complied with one of two options presented by the Tenth Circuit in *Main Street I* to end this heated dispute. In holding that the Pedestrian Easement constituted a public forum, the Tenth Circuit faulted the City for structuring the 1999 sale of the Property so as to "change the forum's status without bearing the attendant costs by retaining the pedestrian easement but eliminating

---

[24] Generally, free speech rights do not apply to private property. *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976). "It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government." *Id.* "[T]he First Amendment [therefore] protects individuals only against government, not private, infringements upon free speech." *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1229 (9th Cir. 1996), *cert. denied*, 519 U.S. 1081 (1997). Further, "[t]he First and Fourteenth Amendments are limitations on state action, not on action by the owner of private property used only for private purposes." *Central Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972). In *Central Hardware*, the United States Supreme Court stated that the "only fact relied upon for the argument that [the defendant's] parking lots have acquired the characteristics of a public municipal facility is that they are 'open to the public.' Such an argument could be made with respect to almost every retail and service establishment in the county, regardless of size or location." *Id.*

In addition, the Court found that, to find state action based upon the mere fact that private property was open to the public, would "constitute an unwarranted infringement of long-settled rights of private property owners protected by the Fifth and Fourteenth Amendments." *Id.* A contrary ruling would transform many religious property owners into state actors, a conclusion without any support in the case law. Thus, Plaintiffs' allegations that the Plaza "serves as a park where the public is invited to gather, relax, and enjoy the open space" are irrelevant. *See* Third Am. Compl. ¶ 26. As the Amended Warranty Deed makes clear, whether the Church allows the public to use the Plaza at all and under what conditions are entirely up to the Church as the private property owner, the same as with Temple Square, which likewise serves as a park-like area that the LDS Church generally allows the public to access, traverse, and enjoy. A private decision by the Church to allow or deny public use of the Plaza cannot be fairly attributable to the state and thus does not, under any theory, constitute state action. *Lugar*, 457 U.S. at 937. Plaintiffs have failed to allege facts that would overcome the settled "presumption that private conduct does not constitute government action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999).

the speech previously permitted on the same property." 308 F.3d at 1131. "In effect, the City

wants to have its cake and eat it too, but it cannot do so under the First Amendment." *Id.* The

Tenth Circuit explained that, to eliminate the public forum, the City would be required to "bear

the attendant costs" by giving up the public access guaranteed by the Easement; otherwise, a

public forum would continue to exist on the City's Easement, just as it had on the old City

sidewalks that had once performed the same public function. *Id.* at 1132. In offering guidance

to the City regarding this unintended result, the Tenth Circuit presented the City with two

options:[25]

> If [the City] wants an easement, the City must permit speech on the easement.
> *Otherwise, it must relinquish the easement so the parcel becomes entirely
> private.*"

*Id.* (emphasis added). Thus, the Tenth Circuit found that the City could terminate the public

forum by selling the Pedestrian Easement to the LDS Church.

After the lengthy process discussed above, the City and the LDS Church entered into the

Settlement Agreement pursuant to which the City "relinquish[ed] the easement" for $5.375

million in land and cash. The right of public access contained in the City's Pedestrian

Easement–which was the linchpin of the Tenth Circuit's public forum analysis–is now gone. In

accordance with the Tenth Circuit's instructions, the Plaza is now "entirely private" property.

Like any other private property owner, the LDS Church has the right to exclude members

---

[25] The Original Special Warranty Deed provided that "[n]othing in the reservation or use of this easement shall be deemed to create or constitute a public forum, limited or otherwise, on the Property." Thus, the City did not contemplate having to impose time, place, and manner restrictions on Main Street Plaza when it reserved the easement for pedestrian access and passage.

of the public from its property and to exercise total control over the activities that occur on its property. Legally, the Plaza is now no different from the adjoining Church-owned Temple Square and Church Administration Block properties, which are entirely private and which are unquestionably subject to Church regulation and control without any First Amendment limitations whatsoever. The City has sold the Pedestrian Easement–the guaranteed right of public passage and access–and, accordingly, no public forum remains, and the City ceased to have a significant property interest in the Plaza sufficient to constitute the state action necessary for any free speech claim under the First and Fourteenth Amendments.

Despite the City's compliance with the Tenth Circuit's directive, Plaintiffs advance various theories as to why the privately owned Plaza should nevertheless be found to constitute a public forum, including that (1) a quintessential public forum–such as the Pedestrian Easement at issue in this case–may not be extinguished, (2) the City and the Church retained the public forum by allegedly making public statements that the Church would continue to allow public access, (3) the sale of the Easement constituted impermissible viewpoint discrimination, and (4) the City's right of reentry creates a public forum. Each of these theories is without merit for the reasons listed above, and for the specific reasons discussed below.

### (a)   A Public Forum May Be Extinguished

First, according to Plaintiffs, the City cannot "privatize a central block of historic Main Street," apparently because it is a "quintessential public forum." Third Am. Compl. ¶¶ 2, 3, 58. There is no support in the law for the proposition that a public forum can never be extinguished. To the contrary, in *Main Street I*, the court expressly stated that relinquishment of the Easement

44

was the only means to eliminate the public forum status of the Easement:

> If it wants an easement, the City must permit speech on the easement. Otherwise, it must relinquish the easement so the parcel becomes entirely private.

308 F.3d at 1132. In so stating, the court recognized that "[t]he mere fact that a space is on what used to be a public street does not automatically render it a public forum." *Main Street I*, 308 F.3d at 1130 (citing *Hawkins v. City & County of Denver*, 170 F.3d 1281 (10th Cir.), *cert. denied*, 528 U.S. 871 (1999)).

In *Hawkins v. City & County of Denver*, a former public street was converted into an open-air, glass-covered pedestrian walkway that led to a performing arts center. The city retained actual ownership of the property. Even though some limited speech was permitted there, the Tenth Circuit upheld the city's right to ban all leafleting and picketing in the walkway, stating:

> [T]he fact that the Galleria was constructed on what used to be a public street does not render it a traditional public forum. The government may, by changing the physical nature of its property, alter it to such an extent that it no longer retains its public forum status. . . . As stated by Justice Kennedy in his *Lee* concurrence: *In some sense the government always retains authority to close a public forum, by selling the property, changing its physical character, or changing its principal use.* Otherwise, the State would be prohibited from closing a park, or eliminating a street or sidewalk, which no one has understood the public forum doctrine to require.

170 F.3d at 1287-88 (quoting *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 699-700 (1992) (Kennedy, J., concurring)) (emphasis added).

In the instant case, the City sold the Easement for an amount that far exceeds its appraised value, it divested itself of any dominion over the property, except for specific public

safety and public utility easements, which, as discussed below are irrelevant to the court's First Amendment analysis, and the LDS Church significantly changed the physical character of the Plaza such that it does not appear to be a mere continuation of the City-owned street and sidewalks that previously existed there.

Moreover, other courts have recognized that a transfer of title to a city street or sidewalk, even without a change in use or physical nature, may eliminate its public forum status. For example, in *International Society for Krishna Consciousness, Inc. v. Reber*, 454 F. Supp. 1385 (C.D. Cal. 1978), a city transferred title to a street and sidewalk to the Knott's Berry Farm amusement park. The property on either side of the former street was owned in fee simple and entirely maintained by a private party. To the average person, the private street and sidewalk continued to appear to be publicly owned, except that a sign was posted stating that the property was privately owned. *Id.* at 1389.

As owner of the former street, Knott's Berry Farm banned proselytizing on the former street, and the Krishna Society sued to enjoin the arrest and prosecution of its members for trespass. Like Plaintiffs in the instant case, the plaintiffs in *Reber* argued that, even though a portion of the street was privately owned and maintained, as long as it was used as a public street, it was a "traditional public forum" for free speech. The court, however, determined that, even though the area appeared to be a public street, the plaintiffs had been informed that it was privately owned and that the private owner had a right to completely cut off access to the property for free speech purposes. *Id.* at 1391. In addition, the *Reber* court recognized that the Supreme Court, in *Hudgens v. NLRB*, 424 U.S. 507 (1976) "had again rejected extending First

46

Amendment protection where expression takes place on private property."[26] *Id.* at 1390.

In the instant case, not only did the City sell the Easement to the LDS Church for an amount that far exceeds its appraised value, but signs clearly denote that the Plaza is private, and the physical characteristics of the Plaza unequivocally set it apart from the public area. Thus, the Plaza and the former Pedestrian Easement have lost all attributes of a public forum.

In arguing for the continued existence of a public forum on the Plaza, Plaintiffs have unearthed a plethora of cases that, at first blush, appear to support their argument that private ownership of property does not nullify First Amendment protections. In actuality, however, none of the cited cases advances Plaintiffs' position.

For example, in *Marsh v. Alabama*, 326 U.S. 501 (1946), the Court found a public forum where a private company owned the entire town. However, in the mid-1970s, faced with numerous claims that the operation of privately owned properties could constitute state action, the Supreme Court limited *Marsh* to its facts, concluding that it applies only when the "property has taken on the attributes of a town, *i.e.*, residential buildings, streets, a system of sewers, a sewage disposal plant" and other similar operations. *Flagg Bros., Inc. v. Brooks*, 536 U.S. 149, 159 (1978) (internal quotations and citation omitted); *see also Hudgens v. NLRB*, 424 U.S. 507 (1976).

---

[26] In analyzing the history of the Supreme Court's treatment of First Amendment expression on private property, the *Reber* court noted that, while the Supreme Court had previously ruled that First Amendment rights could be exercised on private property, referring to *Marsh v. Alabama*, 326 U.S. 501 (1946) and *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308 (1968), the Court had later disapproved of or limited these holdings. *Reber*, 454 F. Supp. at 1390-91.

Plaintiffs also rely on *Evans v. Newton* for the proposition that the First Amendment remains relevant even when the property at issue is ostensibly private. 382 U.S. 296 (1966). In *Evans*, the Court found state action even though title of a city park had been transferred to a private trust in order to avoid a desegregation order. However, as with *Marsh*, the *Evans* case has been limited to situations in which plaintiffs can demonstrate that the transfer of the property did not eliminate "the actual involvement of the city in the daily maintenance and care of the [property]." *Flagg Bros.*, 436 U.S. at 159 n.8.

In the instant case, Plaintiffs have not claimed–and could not in good-faith claim–that the City will be involved in the "daily maintenance and care" of the Plaza. To the contrary, they have alleged that the LDS Church has assumed the governmental functions of the City.

Plaintiffs also rely on a number of cases that they claim specifically stand for the proposition that a public forum is created when the private property owner is performing the public function of maintaining sidewalks. *See, e.g., Venetian Casino Resort, LLC v. Local Joint Executive Bd.*, 257 F.3d 937, 943 (9th Cir. 2001); *Thomason v. Jernigan*, 770 F. Supp. 1195, 1201-02 (E.D. Mich. 1991); *Citizens to End Animal Suffering v. Faneuil Hall Marketplace, Inc.*, 745 F. Supp. 65 (D. Mass 1990); *Jackson v. City of Markham*, 773 F. Supp. 105 (N.D. Ill. 1991). These cases, however, are all materially distinguishable from the present case. In the cases advanced by Plaintiffs, the courts concluded that a public forum existed only after finding that the government possessed a concrete and expressly reserved property interest, such as an easement or a recorded servitude.

For example, in *Venetian Casino*, the developers of the Venetian Casino Resort (the

48

"Venetian"), a hotel and casino complex, commissioned a study to determine the impact the new casino would have on traffic along Las Vegas Boulevard (the "Strip"). The study recommended widening the road by one traffic lane along the Venetian frontage. To widen the roadway, however, the existing public sidewalk along the Venetian frontage would have to be removed. The new lane of traffic would completely fill the State of Nevada's right-of-way on the Strip, leaving no remaining public right-of-way on which to construct a new public sidewalk. Therefore, the new sidewalk would have to be relocated onto the Venetian's property. *See* 257 F.3d at 939-40.

The Venetian entered into negotiations with the State of Nevada Department of Transportation (the "Department") to resolve the issue of continued pedestrian passage along the Strip after widening the street. The Department and the Venetian entered into an agreement (the "1999 Agreement") which stated that the Venetian would construct and maintain on its property a private sidewalk connecting to public sidewalks on either side of its property. The Venetian further agreed to "remove or modify any of the [Venetian's] improvements at the [Venetian's] expense if they become a hazard or obstruction to either pedestrian or vehicular traffic, as reasonably determined by the Department," and to "dedicate necessary right-of-way to the Department and to construct thereon a sidewalk . . . at the [Venetian's] expense should the private sidewalk be removed, altered, or abandoned, and to construct the sidewalk at least equal to the State's standards . . . . " *Id.* at 940. The 1999 Agreement specifies that it is to be recorded and that it is binding on the Venetian's "heirs . . . successors and assigns." *Id.*

Soon after the temporary walkway was constructed, several labor unions applied for a

49

permit to hold a demonstration on the sidewalk in front of the Venetian. The County issued a permit, but the Venetian marked its property lines and erected signs stating that the pedestrian walkway was private property. *Id.* When the demonstration took place, the police department declined to issue citations or make arrests. The Venetian then filed an action, seeking, among other things, a declaratory judgment that the sidewalk was not a public forum. *Id.* at 941.

On appeal, the Ninth Circuit Court of Appeals affirmed the district court's judgment in favor of the County and against the Venetian. The Ninth Circuit determined that "there is a recorded servitude on this parcel of private property upon which the replacement sidewalk is located that the Venetian and its successors and assigns dedicate to public use to provide unobstructed pedestrian access on that sidewalk." *Id.* at 943. The court found that the replacement sidewalk is a thoroughfare sidewalk, seamlessly connected to public sidewalks on either end and intended for general public use," *id.*, and that "the title to the property was held by the Venetian, but by the [A]greement there was a servitude imposed for unobstructed public use of the sidewalk." *Id.*

Unlike the situation in the *Venetian* case, in the instant case, there is no recorded servitude on the Plaza. Indeed, the right to public access and passage was specifically eliminated through the Settlement Agreement and Amended Deed.

Plaintiffs also rely on *Thomason v. Jernigan*, 770 F. Supp. 1195, 1201-02 (E.D. Mich. 1991). In *Thomason*, the court found that a privately owned cul-de-sac fronting an abortion clinic was a public forum despite the fact that the city counsel had voted to vacate the public right-of-way the city held over the private property. The court found that the area had

50

traditionally been held open to the public for expressive activity, and nothing distinguished the property from the other public sidewalks in the city.

Unlike *Thomason,* the Plaza is distinguishable from the public sidewalks, and, moreover, the City did not merely vacate the Pedestrian Easement; rather, it sold it for over $5.375 million to be used to benefit an area of the city that is home to many underprivileged members of the community, and the City received many other benefits, such as a release of potential claims against it regarding the status of the Easement after the decision in *Main Street I*, and release from the unintended responsibility of imposing and enforcing reasonable time, place, and manner restrictions on the Plaza.[27]

The other cases cited by Plaintiffs similarly provide no assistance because, unlike the instant case, they all involve situations in which the government possessed a concrete and expressly reserved property interest, such as an easement or a recorded servitude. *See, e.g., Faneuil Hall,* 745 F. Supp. at 70-72 (finding that the Marketplace was a public forum, in part because land was encumbered by an easement for public access and was indistinguishable from the surrounding public streets and sidewalks); *Jackson v. City of Markham,* 773 F. Supp. 105, 106, 108-09 (N.D. Ill. 1991) (finding that the disputed property was a public forum because it was within the government "highway right of way.").

Plaintiffs have failed to cite any authority involving facts similar to the case at bar, and the relevant case law compels the conclusion that neither Main Street Plaza nor the former

---

[27]    Furthermore, to find that a city could not sell its property and eliminate its public forum would not comport with the Tenth Circuit's determination in *Hawkins v. City & County of Denver,* 170 F.3d 1281 (10th Cir.), *cert. denied,* 528 U.S. 871 (1999).

51

Pedestrian Easement is a public forum. Rather, the entire Plaza is private property to which First Amendment principles do not apply.

### (b)     Plaintiffs' Claim that the Church Orally Agreed to Allow Public Access Is Insufficient As a Matter of Law to Create a Public Forum Issue

Plaintiffs also argue that the City and the Church retained the public forum by allegedly making public statements that the Church would continue to allow public access. Even assuming the truth of Plaintiffs' allegations for the purposes of this 12(b)(6) motion, Plaintiffs have still failed to state a claim.

Currently, the LDS Church voluntarily allows the public to use the Plaza, but the documents that reflect the terms of the sale of the Easement make abundantly clear that the Church is not obligated to do so, and it may, in its sole discretion, terminate that privilege at any time. Regardless of any contrary statements that may have been made in the past, and regardless of any conclusory allegations about secret agreements concerning public access, the parties' agreement is confined to the four corners of the Settlement Agreement and the accompanying Amended Deed. The Settlement Agreement specifically states:

> No Right of Public Access – It is the intent of the Parties to eliminate any right of public access or passage enforceable by the City or by members of the public in relation to the Main Street Plaza Property, and nothing in this Settlement Agreement should be construed otherwise. The Parties do not intend to create any obligation, promise, dedication, servitude, or easement of any kind that would require the [LDS Church] to permit public access or passage.

Settlement Agreement at pp. 6-7, § 6; Amended Deed at pp. 2-4, ¶¶1-2. It is beyond dispute that the Church has the right to invite persons onto the Plaza or to keep them off. Under the terms of

52

the Amended Deed, the LDS Church is the absolute master of the Property. Under such circumstances, Plaintiffs cannot genuinely claim that the Church is bound to allow public access to the Plaza.[28]

Moreover, the integration clause in the Settlement Agreement sets out the Church's and the City's understanding that these instruments embody the entire agreement of the parties, and that any alleged duty or provision outside the written instruments are void as a matter of law. Thus, under Utah law, the Amended Deed and the Settlement Agreement are therefore "the final agreement and all prior terms, whether written or verbal, are extinguished and unenforceable." *Stubbs v. Hemmert*, 567 P.2d 168, 169 (Utah 1977).

Because it is clear that no public right of access exists, Plaintiffs appear to argue that a public forum arises out of the decision by the Church to keep the property open to the public. As the Supreme Court stated in *Lloyd Corporation v. Tanner*, 407 U.S. 551, 569 (1972), property does not "lose its private character merely because the public is generally invited to use it for designated purposes." A private property owner's granting permission for the public to walk on its private property–without any government-owned right of public access–does not create a public forum for First Amendment purposes.

---

[28] The allegations of Plaintiffs' Second Amended Complaint belie this claim. According to Plaintiffs, the Salt Lake City Planning Commission voted against the sale of the Pedestrian Easement, expressing "great concern about the issues of pedestrian access." Second Amend. Compl. ¶ 40. As Plaintiffs implicitly acknowledge, this executive body of City government did not think that the public had a legal assurance of access to the Plaza.

53

### (c)   The Sale of the Easement Does Not Constitute Viewpoint Discrimination

Plaintiffs also argue that, regardless of the private property status of the Plaza, the City's decision not to enforce the terms of the Original Warranty Deed and to then amend that deed constitutes impermissible viewpoint discrimination. Plaintiffs have not cited any authority to support their claim.[29] Plaintiffs cite, among other cases, *Cornelius v. NAACP Legal Defense & Education Fund*, 473 U.S. 788 (1985) to support their argument; however, *Cornelius* does nothing to advance Plaintiffs' argument. Indeed, *Cornelius* recognizes that a court may "not find that a public forum has been created in the face of clear evidence of a contrary interest." 473 U.S. at 803. The other cases relied upon by Plaintiffs for this proposition stand for the unremarkable proposition that government cannot engage in viewpoint discrimination in the administration of government programs or property. *See, e.g.*, *Summum v. City of Ogden*, 297 F.3d 995 (10th Cir. 2002) (involving a city's refusal to accept a church's gift of a monument containing the church's tenets while at the same time displaying a Ten Commandments monument on city property); *East High Sch. Prism Club v. Seidel*, 95 F. Supp. 2d 1239 (D. Utah 2000) (involving an allegedly discriminatory public high school policy for on-campus student clubs).

Furthermore, Plaintiffs' argument ignores the Tenth Circuit's decision in *Hawkins* that a government always retains the right to close a public forum by selling the property to a private

---

[29] Plaintiffs' claim in this regard appears to be very similar to their Establishment Clause claim, and thus, for the same reasons that the court finds that Plaintiffs have failed to state an Establishment Clause claim, they have also failed to establish a claim for viewpoint discrimination under the Free Speech Clause.

party. *See Hawkins*, 170 F.3d at 1287. Perhaps most importantly, however, is the undeniable fact that, in deciding not to enforce the terms of the Original Warranty Deed and opting to sell the Easement, Defendants were complying with one of the two options presented to the City by the Tenth Circuit in *Main Street I* to resolve this bitter dispute. Thus, the Tenth Circuit's analysis in *Main Street I* is fatal to Plaintiffs' claim that the sale was concocted by the City to suppress viewpoints contrary to the LDS Church.[30]

### (d)    The City's Right of Re-entry Is Insufficient to Trigger a Public Forum Analysis

Finally, Plaintiffs claim that the right of re-entry–which requires that the Church maintain the property as a "landscaped space" and refrain from any construction which would block the view corridor–is a sufficient government property interest to trigger a First Amendment analysis.[31] Indeed, they argue that "the reverter [is] the very basis for their claim that the City had not completely relinquished its interest in the property" and that the reverter clause "is the enforcement mechanism for ensuring that the property continues to function as a public space and as a pedestrian thoroughfare." Letter of Supplemental Authority dated February 19, 2004,

---

[30] Given the Tenth Circuit's explicit discussion regarding eliminating the public forum status of the Easement by relinquishing it to make the Property entirely private, it is puzzling that Plaintiffs would allege that the relinquishment of the Easement is "nothing more than a façade for viewpoint discrimination and [a] transparent effort to circumvent the Court of Appeals' decision in *Main Street I*." Third Am. Compl. ¶ 60.

[31] Under the terms of the Amended Warranty Deed, this right to re-entry is very limited. It does not prohibit the Church from erecting fences and gates (so long as they do not obstruct the view corridor), nor does it prohibit the LDS Church from closing the Plaza altogether by erecting signs or taking other actions to keep the public off of its property. *See* Amended Warranty Deed at pp. 2-4, ¶¶ 1-2.

from Mark J. Lopez.

Plaintiffs appear to disregard the fact that the right of re-entry in this case has nothing to do with ensuring public space or access. Unlike the reverter clause at issue in *Main Street I*–which gave the City the right to take possession of the Easement if public access was denied by the Church–the right of re-entry contained in the Amended Deed gives the City no such right.[32]

Under the current Amended Deed, the LDS Church now holds title to the Plaza in fee simple, *i.e.*, with a fee simple determinable interest. *See Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 485 (10th Cir. 1998) ("Under well-settled rules of property law, the Association obtained a *fee simple determinable* . . . while the government retained a possibility of reverter.") (emphasis added). As owner of a fee simple determinable interest, the Church is the only party with a present interest in the land, and thus has full control over the land. *See Choctaw O. & G.R.R. Co. v. Mackey*, 256 U.S. 531, 538-39 (1921) (stating that a holder of fee simple determinable interest constitutes the "absolute owner of the land"). In addition, as owner of a fee simple determinable interest, the Church has the "exclusive right of possession." *Mount Olivet*, 164 F.3d at 485. In contrast, the City retains a possibility of reverter (or right of re-entry), which "is a future contingent interest in real property, and, at best, a future estate in land." *Id.* A possibility of reverter is a "limited interest in the property" and "is immaterial with respect to the current right of possession and does not establish ownership of the property." *Id.*;

---

[32] The parties in this action often refer to the right of re-entry as a "reverter clause." For purposes of this action, the label used to characterize this provision is legally irrelevant.

*see also Woodville v. United States*, 152 F.2d 735, 738 (10th Cir. 1946). More importantly, because a possibility of reverter is only a future interest and not a present interest in land, the Tenth Circuit has held that it is "not property in the constitutional sense." *Mt. Olivet*, 164 F.3d at 485.

In *Main Street I*, to determine whether the Main Street Plaza was sufficiently burdened by the government (through its Pedestrian Easement) to implicate First Amendment forum principles, the Tenth Circuit considered, among other things, whether government condemnations of easements are takings under the Fifth Amendment, and therefore entitling the grantor to compensation. *See* 308 F.3d at 1122. Concluding that the taking of an easement is compensable under the Constitution, the Tenth Circuit held that such a property interest also was sufficient to trigger public forum principles under the First Amendment. *See* 308 F.3d at 1122-23. Applying this same standard to the right of re-entry here, it is clear that this right does not constitute a government interest sufficient to establish a First Amendment forum. Thus, under a Fifth Amendment takings analysis, courts do not recognize a compensable interest in a possibility of reverter (or right of re-entry).[33] With one limited exception not applicable

---

[33] *See e.g.*, Laura H. Burney, *Just Compensation and the Condemnation of Future Interests: Empirical Evidence of the Failure of Fair Market Value*, 1989 BYU L. Rev. 789, 804 & n.67 ("Most courts follow the Restatement's test, resulting in the denial of compensation to the future interest holder in the vast majority of cases.") (citing cases); *Woodville, Okl. v. United States*, 152 F.2d 735 (10th Cir. 1946) (noting that "[w]hether the plaintiff's right is a possibility of reverter upon a determinable fee, or a right of entry for breach of a condition subsequent, he had when the land was taken no right to the land and no possession of it. . . . When once granted, there is nothing left in the donor but a possibility or right of reverter which does not constitute an actual estate.") (quotations and citation omitted); *United States v. 726.23 Acres of Land*, 746 F.2d 1363, 1364 (8th Cir. 1984) (stating "the compensation for condemnation must be paid to the owner of the defeasible fee without apportionment to the holder of the reversionary interest.");

here,[34] all conclude that the future property interest held by a party in this situation is so

insignificant that no compensation is required.  Similar arguments outside the Fifth Amendment

context–that a right of reverter held by a governmental entity constitutes some kind of "public

trust" and therefore constitutes a significant burden on the land–have also been squarely rejected

by the courts.[35]

Nevertheless, Plaintiffs, in their Letter of Supplemental Authority Dated February 19,

2004, claim that the existence of a reverter clause is sufficient to constitute state action, citing

*Hampton v. City of Jacksonville*, 304 F.2d 320 (5th Cir. 1962); *United States v. Mississippi*, 499

F.2d 425, 430-432 (5th Cir. 1974), and *Eaton v. Grubbs*, 329 F.2d 710 (4th Cir. 1964 (en banc)).

Unlike these cases, however, the City in the instant action has not transferred a public function to

---

*United States v. 50.822 Acres of Land*, 950 F.2d 1165, 1169 (5th Cir. 1992) (upholding an award of nominal damages for condemnation of "possibilities of reverter" considered to be "worthless"); *Murphy v. Bilbray*, 782 F. Supp. 1420, 1434 (S.D. Cal. 1991) ("possibilities of reverter may not comprise guarantees so fundamental as to be reposed in the Constitution . . . of the United States . . . ."); *Cline v. Johnson County Bd. of Ed.*, 548 S.W.2d 507, 508 (Ky. 1977) (because "a reversionary right of entry, like a possibility of reverter, amounts to no more than an expectancy, it does not come within the constitutional protection of 'vested rights'").

[34] The only exception is if, at the time of the taking, a breach of the reverter clause is "imminent." This is a very difficult test to meet, *See, e.g., People v. City of Fresno*, 26 Cal. Rptr. 853 (Cal. Ct. App. 1962), *Carter v. New York Cent. R.R.*, 73 N.Y.S. 2d 610, 613 (N.Y. Sup. Ct. 1947). In any event, there is absolutely no allegation in Plaintiffs' Third Amended Complaint that the Church ever plans to breach the reverter clause, much less that such a breach is imminent. To the contrary, there is an express allegation that the Church will operate the Plaza "just as it did before," in perfect harmony with the right of re-entry. Third Amend. Compl. ¶ 57.

[35] *See W.A. Foote Mem'l Hosp., Inc. v. Kelley*, 211 N.W.2d 649, 661-62 (Mich. 1973) (recognizing that a right of reverter does not create a public trust); *Newburyport Redev. Auth. v. Commonwealth*, 401 N.E.2d 118, 136 n.13 (Mass. App. 1980) (finding that "the existence of a condition that property revert to the proprietors if not used for specified purposes is inconsistent with an intent to create a public trust in perpetuity").

the LDS Church. Main Street Plaza is now a private space operated for its owner's private purposes. The right of re-entry here has absolutely nothing to do with any right for the public to pass across the property, access it, or otherwise use it as a thoroughfare. It is not a mechanism to allow the City the right to control the expressive activities of the public. The right of re-entry does not prohibit the LDS Church from erecting fences and gates, so long as they do not obstruct the view corridor, nor does it prohibit the Church from closing the Plaza altogether by erecting signs or taking other actions to keep the public off its property. Rather, the right of re-entry protects the City's right to maintain the view corridor, to enforce its fencing limitations, and to preserve its easements for public safety and utilities. Unlike the Easement in *Main Street I* (which guaranteed public access and passage across the property), the right of re-entry at issue in the instant case does not give the City the right to use the Plaza as a public facility or to enforce a right of public access and passage. In the current case, there is no right for the public to be on the property at all. The provisions of the Amended Deed governing the right of re-entry are simply not the kind of property interests or regulations that trigger First Amendment protections.[36]

### 2. Conclusion

The Property at issue is now an entirely private, Church-owned Plaza devoid of any

---

[36] Virtually every piece of property has some sort of government property interest associated with it. From utility easements to fire and safety easements, from zoning restrictions to view corridors, government utilizes a broad range of mechanisms to preserve safety and other community interests. Plaintiffs have not claimed (and could not successfully claim) that these types of interests–which do not give the public a right to access or pass across the property– should invite First Amendment scrutiny.

government property interests that could possibly create a public forum. The Main Street Plaza

is not a speech forum at all. The free speech guarantees of the First and Fourteenth Amendments

do not apply to the Plaza or to the now-extinguished Pedestrian Easement. Accordingly,

Plaintiffs' First Cause of Action is dismissed.

## C.   ESTABLISHMENT CLAUSE

The First Amendment states, in relevant part, that the government "shall make no law

respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court has long

held that a governmental act does not violate the Establishment Clause if (1) it has a secular

purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster an

excessive entanglement of church and state. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

As noted by the Tenth Circuit, the Supreme Court has repeatedly recognized that "there can be

no precise Establishment Clause test capable of ready application, and therefore [it] has resisted

confining such sensitive analyses to 'any single test or criterion.'" *Bauchman v. West High Sch.*,

132 F.3d 542, 550 (10th Cir. 1997), *cert. denied*, 524 U.S. 953 (1998) (quoting *Lynch v.

Donnelly*, 465 U.S. 668, 678-79 (1984)).[37]

In *Lynch v. Donnelly*, Justice O'Connor drafted a concurring opinion in which she

encouraged the Court to refine the *Lemon* analysis to focus more on whether the government is

---

[37] As stated in *Bauchman*, "[i]ndeed, many believe the Court's modern Establishment Clause jurisprudence is in 'hopeless disarray,' *Rosenberger v. University of Va.*, 515 U.S. 819, 861 (1995) (Thomas, J., concurring), and in need of '[s]ubstantial revision.' *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 656 (1989) (Kennedy, J. concurring in part and dissenting in part)." *Bauchman*, 132 F.3d at 551; *see also Lee v. Weisman*, 505 U.S. 577, 619 (1992) (noting that there are "difficult questions" dividing the Court on Establishment Clause interpretation).

"endorsing" religion. *Bauchman*, 132 F.3d at 551 (citing *Lynch*, 465 U.S. at 687-94).  Under

Justice O'Connor's refined analysis, "the government impermissibly endorses religion if its

conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a

particular religious belief is favored or preferred." *Bauchman*, 132 F.3d at 511 (citing *County of*

*Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 592-93 (1989)).   While the Supreme

Court is not unanimous in its adoption of the "endorsement test," it is now widely accepted as

the controlling analytical framework for evaluating Establishment Clause claims. *See*

*Bauchman*, 132 F.3d at 552; *see also Bauchman*, 132 F.3d at 565 (Murphy J., dissenting) ("A

careful reading of the Court's post-*Lynch* opinions, however, leads to the conclusion that a

majority of the Court has adopted Justice O'Connor's emphasis on endorsement.") .

The Tenth Circuit has determined, however, that "the uncertainty surrounding the present

Court's position regarding the appropriate scope of the endorsement test and the appropriate

Establishment Clause analysis, in general, cautions us to apply both the purpose and effect

components of the refined endorsement test, together with the entanglement criterion imposed by

*Lemon*."[38] *Id.* at 552; *see also Summum v. City of Ogden*, 297 F.3d 995, 1010 (10th Cir. 2002)

(finding that, while the health of the standard of Establishment Clause analysis developed in

*Lemon* may be the subject of some debate, *Lemon* has not been overruled and remains the

starting point for the court's Establishment Clause analysis.)

As demonstrated below, accepting Plaintiffs' allegations as true for purposes of these

---

[38] In *Main Street I*, the Tenth Circuit reversed the district court's ruling under the Free
Speech Clause, and accordingly declined to address the plaintiffs' Establishment Clause claim,
which had been dismissed on summary judgment by the trial court.

motions, and applying both the purpose and effect components of the refined endorsement test, together with the entanglement criterion imposed by *Lemon*, Plaintiffs have failed to state a claim under the Establishment Clause.

1.    **The City's Sale of the Easement Satisfies the Purpose Prong of the Endorsement Test**

The Constitution does not require that the purpose of every government-sanctioned activity be unrelated to religion. *Bauchman*, 132 F.3d at 553.   Plaintiffs must allege facts indicating that Defendants have no "clearly secular purpose" in selling the Easement.   *Id.* at 554. The government's actions violate the Establishment Clause only if the actions were "*entirely* motivated by a purpose to advance religion." *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985) (emphasis added).[39]   As the Supreme Court stated in *Lynch*, "[w]ere the test that the government must have 'exclusively secular' objectives, much of the conduct and legislation this Court has approved in the past would have been invalidated." 465 U.S. at 681 n.6.[40]   Thus, mixed-purpose

----

[39] *See also Lynch v. Donnelly*,  465 U.S. 668, 680 (1984) ("The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but *only* when it has concluded that there was no question that the statute or activity was motivated *wholly* by religious considerations.") (emphasis added); *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987) ("[*Lemon*'s purpose prong] does not mean that the law's purpose must be unrelated to religion–that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted.") (citations and quotations omitted).

[40] *See also Bowen v. Kendrick*, 487 U.S. 589, 603 (1988) ("even if it is assumed that [the legislation] was motivated in part by improper concerns," the statute passes secular purpose analysis because there are also "legitimate secular goals that are furthered by the [legislation]"); *Freethought Soc'y v. Chester County*, 334 F.3d 247, 262 (3d Cir. 2003) ("the purpose prong of *Lemon* only requires *some* secular purpose, and not 'that the purposes of the [religious] display are "exclusively secular.'") (quoting *Lynch*, 465 U.S. at 681 n.6 (emphasis added)); *Bown v. Gwinnett County Sch. Dist.*, 112 F.3d 1464, 1469 (11th Cir. 1997) ("the statute's purpose need

situations–where the purpose of the government's action is to advance both secular and religious goals–still pass muster under the secular purpose inquiry.[41]

The government's conduct necessary to satisfy the secular purpose requirement has been described as a "fairly low hurdle." *Barghout v. Bureau of Kosher Meats & Food Control*, 66 F.3d 1337, 1345 (4th Cir. 1995); *see also Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 431 (2d Cir. 2002) (finding that the government's conduct necessary to satisfy the secular purpose requirement is "often easily satisfied."). In short, "[w]hen there are both religious and legitimate, sincere secular purposes motivating the legislation, it appears that the existence of the secular purpose will satisfy the first *Lemon* prong." *Cammack v. Waihee*, 932 F.2d 765, 773 (9th Cir. 1991).

In evaluating the government's purpose, the court's inquiry "should be deferential and limited" where the government has articulated a reasonable secular purpose. *Bauchman*, 132

---

not be exclusively secular"). However, a law will not pass constitutional muster if the secular purpose articulated by the legislature is merely a sham. *Wallace v. Jaffree*, 472 U.S. 38, 64 (1985) (Powell, J., concurring).

[41] The case law is not entirely clear as to the level of religious motivation that must be demonstrated or alleged to invalidate the governmental action under the purpose prong. According to Justice O'Connor, the requirement that the government activity have a secular purpose "is not satisfied . . . by the mere existence of some secular purpose, however dominated by religious purposes." *Lynch v. Donnelly*, 465 U.S. 668, 690-91 (1984) (O'Connor, J., concurring). The Tenth Circuit, in *Bauchman*, stated that plaintiffs may also state a "violation of the Establishment Clause by alleging facts showing that, in spite of the existence of a legitimate secular purpose, the City's *actual* purpose is to endorse . . . . religion." *Bauchman*, 132 F.2d at 554 (emphasis added) (citing, among other cases, *County of Allegheny*, 492 U.S. at 592 and *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)). Regardless of the precise analysis, it is clear that, given the facts and allegations present in the instant case, including the multitude of obvious secular purposes set forth in the 2003 Ordinance, Plaintiffs have failed to state an Establishment Clause claim under the purpose prong of the Establishment Clause analysis.

63

F.3d at 554 (internal citation and quotation marks omitted); *see also Edwards v. Aguillard*, 482 U.S. 578, 586 (1987) (recognizing that courts are normally "deferential to a State's articulation of a secular purpose").[42]   Further, the secular purpose inquiry does not probe the personal motives of those involved in passing a statute or ordinance.   Personal motives are immaterial because, as stated in *Board of Education v. Mergens*, "what is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law." 496 U.S. 226, 249 (1990) (plurality) (emphasis in original).   As Justice O'Connor explained in *Wallace v. Jaffree*, in evaluating the secular purpose of legislation, "a court has no license to psychoanalyze the legislators" in order to ferret out improper subjective intent.   472 U.S. 38, 74 (1985) (O'Connor, J., concurring).

Accordingly, federal courts "defer to [the government's] sincere articulation of a secular purpose" and are "'reluctan[t] to attribute unconstitutional motives to the States, particularly when a *plausible secular purpose* for the State's program may be discerned from the face of the statute.'" *Cohen v. City of Des Plaines*, 8 F.3d 484, 489 (7th Cir. 1993) (quoting *Mueller v. Allen*, 463 U.S. 338, 394-95 (1983)) (emphasis added).   "This is true whether the governing body is a state legislature or a city council." *Id.* at 490.   In addition, the *Cohen* court stated that "[w]e will

---

[42]   Such judicial deference under the Establishment Clause comports with the traditional deference to the stated purposes of any legislative action challenged as unconstitutional. *See Illinois v. Krull*, 480 U.S. 340, 351 (1987) (stating that the Court "presume[s] that legislatures act in a constitutional manner:"); *see also Clements v. Fashing*, 457 U.S. 957, 963 (1982); *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (recognizing that, in judging the constitutional purpose of the legislature, the Court "must have 'due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government.'") (citation omitted).

defer to a municipality's sincere articulation of a secular purpose." *Id.* at 489.   Thus,

invalidation of statutes or ordinances under *Lemon*'s purpose prong is relatively rare.

The Tenth Circuit's decision in *Bauchman* is instructive on the degree of deference that is

appropriate in the present case.  In *Bauchman*, the plaintiff alleged that a public high school

violated the Establishment Clause when, as part of the curriculum of a choir class, it required the

plaintiff to perform religious music in class and at religious sites.  Even though there were no

secular purposes specifically articulated for the school's practice, the Tenth Circuit nevertheless

"discern[ed] a number of plausible secular purposes for the defendants' conduct," noting that it

could "acknowledg[e] prevalent, archetypical secular purposes for defendants' conduct."

*Bauchman*, 132 F.3d at 554 & n.9.  Given those objectively "plausible secular purposes," the

court refused to allow the plaintiff to amend her complaint to allege an unconstitutional religious

purpose because such allegations would have been futile. *See id.* at 559-62.

In the instant case, the secular purposes supporting the extinguishment of the Pedestrian

Easement are not just "plausible"--they are both obvious and numerous.  In the 2003 Ordinance,

the City Council set forth many of these purposes, including: (1) resolving the legal dispute over

the Pedestrian Easement between the City and the Church and bringing an end to the

divisiveness in the community;[43] (2) eliminating the City's unintended responsibility created by

the Tenth Circuit's decision to regulate protected expressive activities on the Main Street Plaza,

with the attendant risk of litigation; (3) enabling the City to construct new and expanded

---

[43]  As noted above, the City also obtained a release from any equitable and legal claims
the Church had against the City as a result of the Tenth Circuit's decision in *Main Street I.*

facilities on the Glendale Property that would provide significant benefits to the community; and

(4) promoting tourism and economic development. 2003 Ordinance at pp. 7-11. Thus, from the

face of the 2003 Ordinance, the sale of the Easement had a "plausible secular purpose." *See*

*Mueller*, 463 U.S. at 394-95.

Moreover, it is undisputed that in exchange for giving up the Pedestrian Easement, which

had been appraised at $500,000, the City obtained (1) the 2.125-acre Glendale Property

(appraised value $275,000); (2) $104,586 in cash for payment of half of the attorneys' fees to the

ACLU as a result of the *Main Street I* litigation; and (3) $5,000,000 in land and cash to be used

for the construction of a City community center for lower-income and underprivileged City

residents. Thus, the City obtained nearly $5.4 million in value for giving up an Easement

appraised at $500,000.[44]

Perhaps for this reason, Plaintiffs do not allege that the transaction lacked a substantial,

objectively verifiable secular purpose. They do not claim–and could not claim–that the City

gave away the Easement for little or nothing.[45] Instead, Plaintiffs allege that, notwithstanding

---

[44]   It is noteworthy that the entire Property, free and clear of all public access encumbrances, was valued at $8.124 million at the time of the sale in 1999. *See Main Street I*, 146 F. Supp. 2d at 1159-61. The Church paid the full $8.124 million without receiving a reduction in price for the reduction in the Property's value due to the Easement. Ultimately, the City will have obtained over $13.5 million for this Property.

[45]   The irony of Plaintiffs' Establishment Clause claim is that Plaintiffs deliberately postponed their lawsuit so that the City would receive all of the secular benefits of the transaction. Plaintiffs could have filed suit during the waiting period established under the Settlement Agreement to allow for challenges to the sale. Plaintiffs have previously acknowledged that the filing of a suit then would have allowed the Church and the Alliance to "walk away from the deal" with the result that "the $5 million raised for the West Side Community Center would be lost, because those funds were contingent on the deal being

substantial secular benefits to the City, the Mayor's deeper, subjective motivation for promoting

the sale and catering to the desires of the LDS Church was not to obtain these financial benefits

but rather to avoid Church-generated "community divisiveness."[46]  At most, Plaintiffs'

allegations suggest that there was a dual purpose in the extinguishment of the Easement–an

alleged desire to pacify the Church while at the same time gaining millions of dollars for the City

and its residents.  Such dual motivations, however, are not unconstitutional:

> Even if it is assumed that [the legislation] was motivated in part
> by improper concerns, the parts of the statute to which appellees
> object were also motivated by other entirely legitimate secular
> concerns. . . . These are all legitimate secular goals that are
> furthered by the [legislation].

---

finalized."  Second Amend. Compl. ¶ 39.  Plaintiffs admit that "[d]ue at least in part to this provision in the Settlement Agreement, no challenge was filed during the closing period."  *Id.* Plaintiff cannot now plausibly argue that the secular benefits of the transaction were a sham.

   [46]  *See* Third Amend. Compl. ¶ 62 ("The Mayor's decision to relinquish the Pedestrian Easement . . . can only be attributable to the pressure applied by the LDS Church and the Church's threats about 'community divisiveness' if the Mayor did not accede to its demands."); *id.* ¶ 64 ("Statements by the Mayor indicate that the threat of community divisiveness by the LDS Church was the major consideration in his decision to capitulate to the Church's demands. . . ."); *id.* ¶ 65 ("The so-called benefits to the City from this deal" "are merely window dressing, subterfuge, and a sham for the real and improper reasons that motivated the Mayor's decision in this case.").

   Plaintiffs' theory that the sale of the Easement violates the Establishment Clause ignores the obvious fact that a church is permitted to make its views known and to participate in the political process like any other person or secular entity.  And elected representatives are fully entitled to listen and respond to the views of churches and religiously motivated constituents so long as a secular purpose supports the governmental action. *See, e.g., Peck v. Upshur County Bd. of Educ.*, 155 F.3d 274, 281 (4th Cir. 1998) ("We do not impute an impermissible purpose to advance religion to an elected official merely because he responds to a religiously motivated constituent request . . . .").

*Bowen v. Kendrick*, 487 U.S. 589, 603 (1988). Such allegations hardly suggest that selling the Easement had no objectively "plausible secular purpose." *Mueller*, 463 U.S. at 394-95.[47]

In addition, the purpose prong does not require or permit a psychological inquiry into the secular purity of Mayor Anderson's personal motivations, much less those of each member of a legislative body like the City Council. Nothing in *Lemon* or its progeny suggests that this court ought to wade into that morass under these facts; indeed, the law is to the contrary. *See Mergens*, 496 U.S. at 249; *Bauchman*, 132 F.3d at 554. Given the undisputed secular benefits that flowed to the City, Plaintiffs' allegations about the subjective intent of the Mayor or City Council are irrelevant.

Plaintiffs disagree, arguing that *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000) holds otherwise. In *Santa Fe*, the Court recognized that, when a government's actions do not plausibly advance the stated secular government purposes, a court need not accept as valid a sham.[48] *Id.* at 305-06. The government's alleged secular purposes in *Santa Fe* were

---

[47] Plaintiffs' "sham" argument would be more compelling if they claimed that all of the purposes identified by the City were actual shams–that is, that the $5 million was not really paid to the City, that the Glendale property was not really transferred to the City, or that the Church did not actually pay half of the City's attorneys' fees obligations. But that is not what Plaintiffs allege here, nor could they truthfully do so.

[48] In their supplemental authority, Plaintiffs also cite *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) for the proposition that a court is obligated to carefully scrutinize the alleged pretextual reasons for the City's actions in the present case for evidence of improper motive and that valid reasons supporting the City's decision to sell the Easement cannot save the City's actions if they were motivated in part by an improper purpose. Plaintiffs contend that this is a uniquely factual issue that cannot be dismissed under Rule 12(b)(6) or Rule 56. *Axson-Flynn*, however, is inapposite.

*Axson-Flynn* is not an Establishment Clause case, but rather a compelled speech case

held to be implausible because they were plainly not advanced by the challenged student prayer policy. *Id.* Unlike *Santa Fe*, however, the court cannot conclude in the instant case that the stated secular purposes are implausible. *Santa Fe* would perhaps support Plaintiffs' argument in this case had the City simply given away the Easement under the guise of serving a secular purpose, but that is far from the events that transpired in this case.

In sum, the City made the rational decision to sell the Easement to the LDS Church for ten times its fair market value–allowing the City to construct a community center, resolve a difficult legal dispute, and put to rest an extremely divisive issue. Although Plaintiffs may well have voted otherwise if they had been members of the City Council, they cannot now satisfy the endorsement/purpose prong under the requisite "deferential and limited" inquiry. *Bauchman*, 132 F.3d at 554. Accordingly, Plaintiffs have failed to allege any facts that demonstrate anything other than legitimate and primary secular purposes in the City's conduct.

### 2.    The City's Sale of the Easement Did Not Have the Primary Effect of Advancing or Endorsing Religion

To state a claim under this prong of the endorsement test, Plaintiffs must allege facts

---

brought under the Free Speech Clause. Moreover, it relates to the unique situation of a public university's student's Free Speech rights. The court found, among other things, that "the Supreme Court directed courts not to override a faculty member's professional judgment 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Axson-Flynn*, 356 F.3d at 1293 (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)). Thus, "we may override an educator's judgment where the proffered goal or methodology was a sham pretext for an impermissible ulterior motive." *Id.* To the extent that *Axson-Flynn* has any relevance whatsoever to the instant case, it is that courts will defer to government determinations unless the proffered reason was a sham pretext. In the instant case, Plaintiffs have failed to allege with any well-pleaded facts that the undisputed plethora of secular benefits were actually a sham or that the City's actions were a substantial departure from accepted norms.

indicating that the City's actions had the principle or primary effect of advancing or endorsing religion. *Bauchman*, 132 F.3d at 555. Indeed, as the Supreme Court stated in *Amos*:

> For a law to have forbidden "effects" under [the second prong of] *Lemon*, it must be fair to say that the government itself has advanced religion through its own activities and influence. As the Court observed in *Walz*, "for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement in religious activity."

483 U.S. at 337 (emphasis omitted) (quoting *Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 668 (1970)). In *Bauchman*, the Tenth Circuit recognized that United States Supreme Court precedent "'plainly contemplates that on occasion some advancement of religion will result from governmental action.'" 132 F.2d at 555 (quoting *Lynch*, 465 U.S. at 683). However, "not every governmental activity that confers a remote, incidental, or indirect benefit upon religion is constitutionally invalid." *Id.* Furthermore, this "is an objective inquiry, not an inquiry into whether particular individuals might be offended by" the City's actions or consider them to endorse religion. *Id.*

In *Bauchman* the Tenth Circuit stated that the effect component of the endorsement test "should evaluate whether a 'reasonable observer,' aware of the history and context of the community in which the conduct occurs, would view the practice as communicating a message of government endorsement or disapproval." 132 F.3d at 552 (citing *Capitol Square Review & Advisor Bd. v. Pinette*, 515 U.S. 753, 778-81 (O'Connor, J., concurring)); *Cf. Marshfield*, 203 F.3d at 493 (finding that "[w]hen we find that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is favored or

preferred, the Establishment Clause has been violated.").[49]

As a matter of law, the sale of the Easement did not constitute City "sponsorship," "financial support," or "active involvement" in LDS Church affairs, and no reasonable observer aware of the circumstances of the sale–including the potential for another legal battle over the validity of the Pedestrian Easement after the Tenth Circuit's decision in *Main Street I*, the unintended responsibility imposed on the City after *Main Street I*, the Tenth Circuit's suggestion that the City resolve this issue by extinguishing the Easement, the historic presence of LDS Church property in the center of the City, the fact that the Main Street Plaza is surrounded on both the east and the west sides by LDS Church-owned property, the change in appearance of the Plaza as compared to the public sidewalks, and the need for improvements on the City's west side–could conclude that the sale of the Easement constituted City endorsement of the LDS Church. The City did not give away anything to the Church; rather, in selling the Pedestrian Easement, it obtained more than ten times its fair market value, and also obtained a community center, settlement of a potentially expensive legal dispute regarding the effect of the decision in *Main Street I*, and resolution of an acrimonious issue dividing the community. Such action

---

[49] "[T]he proper level of understanding to impute onto our mythical reasonable observer," *Marshfield*, 203 F.2d at 495 n.2, is subject to debate. *Compare Capitol Square*, 515 U.S. at 778-79 (O'Connor, J., concurring) (favoring reasonable person who is "a personification of a community ideal of reasonable behavior") *with Capitol Square*, 515 U.S. at 799 (Stevens, J., dissenting) (arguing that any reasonable person who "could perceive a government endorsement of religion" is a reasonable observer). As described below, this court has employed the Tenth Circuit's standard, as articulated in *Bauchman*. However, the court notes that any reasonable observer, even one not familiar with the underlying circumstances that led to the sale of the Pedestrian Easement in this case, would not believe that the Main Street Plaza was public property and would not perceive that the City, by selling the Plaza or the Pedestrian Easement, was endorsing religion.

71

constitutes neither sponsorship nor financial support, but rather an arms-length transaction between the LDS Church and the City.    The primary effect of the transaction was neither to promote nor endorse religion.

That the LDS Church also benefitted from the transaction is constitutionally irrelevant in this context.    The Constitution does not bar the government from selling property to religious organizations under mutually advantageous terms.    "A [government act] is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose." *Amos*, 483 U.S. at 337 (emphasis in original).

Plaintiffs have cited no case law to suggest that the City's actions in this case endorsed or promoted religion.    Plaintiff's citation to *Paulson v. City of San Diego*, 294 F.3d 1124 (9th Cir. 2002), *cert. denied*, 538 U.S. 978 (2003) is not persuasive.    Although Plaintiffs claim that the *Paulson* court ruled that the sale of property to a religious organization violated the Establishment Clause, Plaintiffs neglect to mention that the case was decided solely under the much more expansive provisions of the California Constitution prohibiting any aid to religious organizations. *Id.* at 1129.

In addition, Plaintiffs are not aided by the Seventh Circuit's decision in *Freedom from Religion Foundation, Inc. v. City of Marshfield*, 203 F.3d 487 (7th Cir. 2000).    In *Marshfield*, the court found an Establishment Clause violation after the city sold a portion of a public park to the Henry Praschak Memorial Fund, Inc. (the "Fund").    On the .15 acre site, there is a statue of Jesus Christ that had previously been given to the City by the Knights of Columbus.    The court was troubled by the fact that the ".15 acre site is not physically differentiated from the

surrounding public park, and no visual boundaries currently exist that would inform the reasonable but unknowledgeable observer that the Fund property should be distinguished from the public park" and that "the statue's positioning and orientation combine with the other physical features to convey the impression that the statue is on city park property." *Id.* at 494-95. Further, the court noted that, "although the City had erected a disclaimer, the disclaimer was placed on Fund property, increasing the risk of confusion over whether [the City] still controls this land." *Id.* at n.1  The court noted, however, that, on remand, the district court may explore how to remedy the existing Establishment Clause violation. *Id.* at 497.  The court stated that, "should the City (on City property) construct some defining structure, such as a permanent gated fence or wall, to separate City property from Fund property accompanied by a clearly visible disclaimer, on City property, we doubt that a reasonable person would confuse speech made on Fund property with expressive endorsement made by the City." *Id.*

Unlike the situation in *Marshfield,* no observer of Main Street Plaza could reasonably conclude that the Plaza is government property.  Not only does Main Street Plaza sit between two LDS Church-owned blocks, but the Plaza looks significantly different from the public sidewalks.  The bollards, street lights, and garbage cans are identical to those used on the adjacent Temple Square and Church Administration Block and the nearby Conference Center. The Plaza's entrances are marked by large planters placed on large stone structures containing waterfalls.  There is distinctive paving, special lighting and landscaping.  Additionally, there are

73

large identifying signs at the entry of the Plaza. *Main Street I*, 146 F. Supp. 2d at 1167.[50]

Finally, in their supplemental authority, Plaintiffs urge the court to follow *Mercier v. City of LaCrosse*, 305 F. Supp. 2d 999 (W.D. Wis. 2004). In *Mercier*, a monument of the Ten Commandments was displayed in Cameron Park, located in downtown La Crosse and owned by the city. After the city declined offers to move the monument to another location, the Freedom from Religion Foundation (the "Foundation") filed a lawsuit. Subsequently, the city sold the monument and a 20' x 22' parcel of land underneath the monument to the defendant Fraternal Order of the Eagles (the "Order"). The Order installed a fence around the parcel and placed signs on each side that indicated that the parcel was now privately owned. The city also erected a second fence just outside the boundary of the Order's parcel. The city also posted a sign on the fence, indicating that it did not own the property and did not endorse the religious speech. *Id.* at 1002. The *Mercier* court, however, determined that the sale of the property to the Order

> did not cure the [E]stablishment [C]lause violation but only shifted it. Now, instead of directly endorsing the religious speech on the monument by displaying it on city-owned land, the City has demonstrated its endorsement by giving the Order permanent, preferential access to display the religious speech on land that is surrounded by city-owned property. I cannot find any meaningful difference between a city's own display of a religious monument and a city's grant of permission to one (and only one) private group to permanently display the monument in the same location when the monument is still surrounded by city property.

*Id.* at 1003.

---

[50] Consequently, in *Main Street I*, the district court found that the "undisputed facts demonstrated that the nature of the Property has been changed so that the Church Plaza is clearly distinguishable from the surrounding streets and sidewalks." 146 F. Supp. 2d at 1167. The factual determinations were not disturbed on appeal.

Thus, the court determined that the city's sale to the Order violated the Establishment

Clause "because it gives preferential treatment to one religious message over all others." *Id.* at

1011.  The court emphasized that

> [t]wo important related facts compel this conclusion: the small size of the parcel
> and its location within the park.  The 22' x20' parcel sold to the Order is
> surrounded on three sides by park land still owned by the City; the fourth side
> borders a public sidewalk.  If the City had sold the entire [] park to the Order,
> there would be a stronger argument that the City had 'divorced itself from the
> religious content' of the monument.

*Id.* at 1011 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000)).  The court

found it relevant that the city had sold to the Order only a "tiny portion of the park" and that "the

parcel is still 'in' the park." *Id.*   It noted that the city had neither allowed any other group to

express a message in the park (at least permanently) nor established a neutral program to

determine which groups may purchase a portion of the land to express their messages.  Rather,

"the Common Counsel had passed a 'special and unusual' act to aid the promotion of one

religious message." *Id.* at 1012.

The *Mercier* court was not persuaded that the sale for fair market value had eliminated

the Establishment Clause violation.  It noted that not all sales made for fair market value pass

constitutional muster: "If this were the rule, a city could refuse to sell property to anyone but

Christians (or Muslims or Wiccans) so long as the city received a fair price for the property." *Id.*

at 1012.  The court recognized that, [w]hether the parcel . . . was free or sold for twice its worth,

the City has still provided the Order (and no one else) with a benefit that many would argue is

much more valuable than free property: the right to use land within the park for the purpose of

expressing a religious message." *Id.* Moreover, the court noted, "[i]f anything, the sale of the parcel exacerbates the violation because it communicates to nonadherents that not only is the City willing to display a Judeo-Christian symbol on public property, but it is also willing to carve up a public park to insure that the symbol does not have to be moved or share its space with displays expressing other viewpoints." *Id.*

While superficially similar to the instant case, the *Mercier* case contains material factual differences that compel a different result. As that court stated, if the city had sold the entire park to the Order, "there would be a stronger argument that the City had 'divorced itself from the religious content' of the monument." *Id.* at 1011 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000)). In the instant case, by selling the Pedestrian Easement to the LDS Church, the City divorced itself completely from the religious content of the Plaza or the speech limitations sought to be enforced by the Church. Moreover, unlike the "tiny portion of the park" that was surrounded by public property in *Mercier*, the City's sale of the Easement made the entire Plaza private property that was surrounded by other LDS Church-owned land.

In addition, Plaintiffs in the instant action have not alleged (and could not allege) that the City Council had "passed a 'special and unusual' act to aid the promotion of one religious message." *Mercier*, 305 F. Supp. 2d at 1012. There is also no allegation that the City has refused to sell property to other religious groups or that any other group even desired to buy the Easement or Main Street Plaza itself. Perhaps most importantly, the court in *Mercier* did not evaluate whether any secular purpose was served by selling the parcel of land, presumably because no secular purpose could be articulated. In the instant case, not only did the City

receive more than ten times the appraised value of the Easement, but it did not merely go into City coffers. The money received was dedicated to a specific project that would help an area of the City that is home to many underprivileged individuals. In addition, the City obtained a valuable release of claims by the LDS Church against the City regarding the existence/survivability of the Easement after *Main Street I*, and the City was relieved of the unintended (and likely costly) burden of devising and then enforcing reasonable time, place, and manner restrictions. The City has also avoided potential litigation involving those restrictions. Accordingly, *Mercier* is quite unlike the present case.

Thus, Plaintiffs have failed to successfully allege that the City's actions had the principle or primary effect of advancing or endorsing religion.

### 3.  The City's Sale of the Easement Does Not Constitute Entanglement

As noted by the Tenth Circuit in *Bauchman*, "[t]he entanglement analysis typically is applied to circumstances in which the state is involving itself with a recognized religious activity or institution." 132 F.3d at 556. The sale of the Easement actually eliminated the likelihood of excessive entanglement between the Church and the City. Following the Tenth Circuit's decision in *Main Street I*, the City was in the constitutionally awkward position of having to regulate a public forum in the middle of the LDS Church's Main Street Plaza. Selling the Pedestrian Easement to the Church eliminated the need for coordination between the Church and the City in the management of the Plaza. Thus, entanglement is not an issue.

### 4.  The Tenth Circuit's Decision in *Main Street I*

The unique circumstances of this case cannot be ignored. As noted previously, the Tenth

77

Circuit stated in *Main Street* I that the City could fix the constitutional problem by "relinquish[ing] the easement so the parcel becomes entirely private." 308 F.3d at 1132. The City's decision to follow the Tenth Circuit's suggestion that it relinquish the property to make it completely private–while extracting over $5 million from the LDS Church in exchange for the Easement–is not unconstitutional under any reading of the Establishment Clause.[51]

### 5.     Conclusion

Plaintiffs have not stated a claim under the Establishment Clause. The sale of the Easement to the LDS Church, even assuming *arguendo* that it was partially motivated by the religious purposes of those involved, served a reasonable secular purpose, discernable from the face of the 2003 Ordinance.   In light of the undeniable facts of this case, Plaintiffs have failed to allege that the City's actions had the principle or primary effect of advancing or endorsing religion, as a reasonable observer would not view the decision to sell the Easement as communicating a message of government endorsement of the LDS Church. In addition, Plaintiffs have failed to adequately allege that the sale of the Easement creates excessive entanglement between the City and the LDS Church. If anything, the sale actually eliminated the likelihood of excessive entanglement. Finally, when the City merely elected one of two choices presented by the Tenth Circuit, it can hardly be said that the reason for its decision was to promote or endorse the LDS Church.

---

[51] In the most recent iteration of their Complaint, Plaintiffs newly allege that the appraisal of the Easement failed to account for its full value. *See* Third Amend. Compl. ¶ 51. But nowhere do Plaintiffs allege that the Easement was worth more than the $5.375 million the City received. And, as noted above, the appraised value of the entire Property, without the Easement, was only $8.124 million. *Main Street I*, 146 F. Supp. 2d at 1159-60.

## D. UTAH CONSTITUTION

Plaintiffs additionally allege a violation of the Constitution of Utah, Article I, Section 4. That provision states that "[t]he State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. . . .    There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions.  No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment."  Utah Const., Art. I.,§ 4.

The Utah Supreme Court has stated that "when we interpret the religion clauses of the Utah Constitution, we do not rely on federal case law interpreting the religion clauses of the United States Constitution." *See Snyder v. Murray City Corp.*, 73 P.3d 325, 333 n.4 (Utah 2003) (citing *Society of Separationists v. Whitehead*, 870 P.2d 916, 931 n.36 (Utah 1993)). Nevertheless, regarding their state constitutional claim, Plaintiffs have stated merely that, "to the extent that the analysis under the Utah constitution mirrors the analysis of the federal constitutional claims, plaintiffs rest on these arguments in defense of the viability of their state constitutional claims."  Pls.' Mem. in Opp'n to Mot. to Dismiss at 28 n.15.

For the same reasons that the court has found that Plaintiffs have failed to state a federal constitutional claim against Defendants, the court further finds that Plaintiffs have also failed to state a claim under the Utah Constitution.  To the extent the analysis of the Utah Constitution might differ from the analysis under the federal constitution, Plaintiffs have waived any such claim.

79

## E. MAYOR ANDERSON AS A DEFENDANT

Plaintiffs have named Mayor Anderson in his official capacity as Mayor of Salt Lake City, and they have also named Salt Lake City Corporation, which is the real party in interest in this action. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, (1985); *Hafer v. Melo,* 502 U.S. 21, 24-25 (1991). Thus, in addition to the substantive reasons for dismissal stated above, the court also dismisses the claims against Mayor Anderson on the separate and independent ground that naming him as a Defendant is redundant and provides no opportunity for further relief than Plaintiffs' suit against the City. *See, e.g., Doe v. Douglas County Sch. Dist. Re-1*, 775 F. Supp. 1414, 1416 (D. Colo. 1991).

## IV. MOTIONS TO STRIKE

## A.     PLAINTIFFS' MOTION TO STRIKE MATERIALS FROM DEFENDANTS' MOTION TO DISMISS

Plaintiffs have requested that the court strike the extrinsic materials from the City Defendants' Motion to Dismiss. The City Defendants argue that it would not be improper to consider their exhibits on a motion to dismiss and also that the court could convert the Motions to Dismiss to Motions for Summary Judgment.[52] The court finds, however, that the Motion is

---

[52] While the court has not treated the Motions to Dismiss as Motions for Summary Judgment, it likely would not have been improper to do so. Although the court did not give notice to the parties that it would treat the motions as summary judgment motions, the Defendants agreed to permit Plaintiffs to conduct discovery related to their Motion for Preliminary Injunction. Indeed, the fact that Plaintiffs could not claim surprise by the court's treatment of the motions as summary judgment motions is demonstrated in at least one of their letters of supplemental authority in which they state that the issue concerning the City's motivation to sell the Easement "is uniquely factual and cannot be dismissed under either FRCP 12(b)(6) or *Rule 56.*" *See* Pls.' Letter of Supplemental Authority dated February 12, 2004 (emphasis added).

moot, because the court has not relied on any of the exhibits offered in support of the Motions to

Dismiss, except, as noted above, the 2003 Ordinance, which includes, as Exhibits A and B,

respectively, the Settlement Agreement and the Amended Special Warranty Deed.

**B.      PLAINTIFFS' MOTION TO STRIKE THE DECLARATIONS OF THOMAS G. ALEXANDER, PRESIDING BISHOP BURTON, AND MAYOR ANDERSON OR IN THE ALTERNATIVE FOR LEAVE OF COURT TO DEPOSE DECLARANTS AND SUPPLEMENT THE RECORD**

Plaintiffs have also sought to strike the declarations of Thomas G. Alexander, Presiding

Bishop Burton, and Mayor Anderson.  In the alternative, Plaintiffs have requested leave of court

to depose the declarants and supplement the record.[53]  Again, because the court has not relied on

any of these declarations in analyzing whether Plaintiffs have stated a claim under Rule 12(b)(6),

the motion is moot.

**C.      THE LDS CHURCH'S MOTION TO STRIKE BARBER DECLARATION AND PORTIONS OF THE DECLARATION OF DANI EYER**

Finally, the LDS Church has requested that this court strike the Declaration of Benjamin

R. Barber and portions of the Declaration of Dani Eyer, which were offered in support of

Plaintiffs' Motion for Preliminary Injunction.  While it is doubtful that testimony of Mr. Barber

and portions of Ms. Eyer's testimony would be admissible for purposes of summary judgment or

---

Consideration of the extrinsic evidence offered by the parties bolsters the court's conclusion that Plaintiffs' claims must be dismissed because Plaintiffs have failed to demonstrate that a material disputed fact existed about any genuine issue.

[53] At the hearing on this matter, the court stated that it would not grant leave to depose Bishop Burton or Mayor Anderson, as Plaintiffs had already had an opportunity to depose these individuals.  The court, however, indicated that it would permit Plaintiffs to depose Mr. Alexander and then to supplement the record.  Plaintiffs' counsel, however, declined the court's invitation.

81

trial, the court has great discretion in considering evidence in a preliminary injunction and therefore declines to strike these declarations.

## V. CONCLUSION AND ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that (1) Plaintiffs' Motion for Preliminary Injunction [Docket # 23] is DENIED; (2) the City's Motion to Dismiss [Docket # 52] is GRANTED, and all claims against Salt Lake City Corporation and Ross C. "Rocky" Anderson are DISMISSED with prejudice; (3) the LDS Church's Motion to Dismiss [Docket # 49] is GRANTED, and all claims against the LDS Church are DISMISSED with prejudice; (4) Plaintiffs' Motion to Strike Materials from Defendants' Motion to Dismiss [Docket # 92] is DENIED AS MOOT, (5) Plaintiffs' Motion to Strike Declarations of Thomas G. Alexander and Ross C. Anderson or in the Alternative, for Leave of Court to Depose Declarants and Supplement the Record [Docket # 95] is DENIED AS MOOT, and (6) the LDS Church's Motion to Strike Barber Declaration and Portions of Eyer Declaration [Docket # 77] is DENIED. This action is DISMISSED in its entirety, and the Clerk of the Court is directed to enter judgment accordingly.

DATED this 3rd day of May, 2004.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

blk

United States District Court
for the
District of Utah
May 3, 2004


* * CERTIFICATE OF SERVICE OF CLERK * *


Re:  2:03-cv-00688



True and correct copies of the attached were either mailed, faxed or e-mailed
by the clerk to the following:


     Mr. Steven W. Allred, Esq.
     SALT LAKE CITY ATTORNEYS OFFICE
     451 S STATE ST STE 505
     SALT LAKE CITY, UT  84111
     EMAIL

     Mark J. Lopez, Esq.
     AMERICAN CIVIL LIBERTIES UNION
     125 BROAD ST 17TH FL
     NEW YORK, NY  10004
     EMAIL

     Sharon M. McGowan, Esq.
     AMERICAN CIVIL LIBERTIES UNION
     125 BROAD ST 17TH FL
     NEW YORK, NY  10004

     Margaret D. Plane, Esq.
     AMERICAN CIVIL LIBERTIES UNION OF UTAH
     355 N 300 W STE 1
     SALT LAKE CITY, UT  84103

     Mr. Alan L Sullivan, Esq.
     SNELL & WILMER LLP
     15 W SOUTH TEMPLE STE 1200
     GATEWAY TOWER W
     SALT LAKE CITY, UT  84101
     EMAIL

     Von G Keetch, Esq.
     KIRTON & MCCONKIE
     60 E S TEMPLE STE 1800
     SALT LAKE CITY, UT  84111-1004
     EMAIL

     Mr. Michael P O'Brien, Esq.
     JONES WALDO HOLBROOK & MCDONOUGH
     170 S MAIN ST STE 1500
     PO BOX 45444
     SALT LAKE CITY, UT  84145-0444

**Mr. Randy L Dryer, Esq.**
**PARSONS BEHLE & LATIMER**
**201 S MAIN ST STE 1800**
**PO BOX 45898**
**SALT LAKE CITY, UT   84145-0898**
**EMAIL**